# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BHANU RAM and  MAHESH THAKUR,

      Plaintiffs,

vs.                                        No. CIV 05-1083 JB/WPL

NEW MEXICO DEPARTMENT
OF ENVIRONMENT, NED JERABEK,
Individually and as a Supervisor of NMDOE
and RICHARD GOODYEAR, Individually
and as a Supervisor of NMDOE,

      Defendants.

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER[1]

---

[1]The Court filed its Findings of Fact and Conclusions of Law and entered Final Judgment in this case on June 27, 2007.  See Findings of Fact, Conclusions of Law, and Order, filed June 27, 2007 (Doc. 172); Final Judgment, filed June 27, 2007 (Doc. 173).  Subsequent to entering Final Judgment, however, the Court has had occasion, based on research it conducted in another case, to reconsider some aspects of its Conclusions of Law regarding the Plaintiffs' claims that they were unlawfully retaliated against for engaging in protected activity.

On June 29, 2007, the Court sent notice to the parties that it was reconsidering certain aspects of its Conclusions of Law and that, if it chose to alter or amend its Conclusions of Law and/or its Final Judgment, it would, pursuant to rule 59(e) of the Federal Rules of Civil Procedure, file such alterations within ten days of the date it entered its Final Judgment.  See Letter from The Court to George T. Geran and M. Karen Kilgore (dated June 27, 2007), filed June 29, 2007 (Doc. 174); Fed. R. Civ. P. 59(e) (requiring a motion to alter or amend the judgment be filed within ten days of the entry of judgment); Sun-Tek Indus., Inc. v. Kennedy Sky Lites, 929 F.2d 676, 678 (Fed. Cir. 1991)(acknowledging court may amend its judgment pursuant to its own motion within rule 59(e)'s time limits); Charles v. Daley, 799 F.2d 343, 348 (7th Cir. 1986)("[T]he purpose of Rule 59 is to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings."); Burnam v. Amoco Container Co., 738 F.2d 1230, 1232 (11th Cir. 1984)("[S]o long as the court acts within ten days after the entry of judgment, the court has the power on its own motion to consider altering or amending a judgment."); Bryant v. N.J. Dep't of Transp., 998 F. Supp. 438, 442 (D.N.J. 1998)(holding a district court acting within the time limits of rule 59(e) may invoke the rule sua sponte); Sargent v. Columbia Forest Prods., Inc., No. 2:93-CV-116, 1994 WL 902817, at *2 (D. Vt. Sept. 7, 1994)(same); Thomas v. Bd. of Exam'rs, No. 85 C 09647, 1986 U.S. Dist. LEXIS 26055 (N.D. Ill. Apr. 30, 1986)(same).  This opinion contains the Court's reconsidered Conclusions of Law.

**THIS MATTER** comes before the Court on the parties' Stipulation, filed January 16, 2007 (Doc. 141)("Stipulation").  The Court held a trial in this case from December 18, 2006 through January 5, 2007.  The primary issues are: (i) whether Plaintiffs Bhanu Ram and Mahesh Thakur have proven by a preponderance of the evidence that Defendants New Mexico Department of Environment ("NMED"), Ned Jerabek, and Richard Goodyear discriminated against them because of their Indian national origin; and (ii) whether the Defendants retaliated against Ram and Thakur, because Ram and Thakur engaged in activity that the Constitution or federal law protects.  Because Ram proved by a preponderance of the evidence that the Defendants issued him a letter of reprimand on July 18, 2003 in retaliation for protected activity in which he engaged, the Court finds that the Defendants retaliated against him; because he has not shown that he was damaged by such acts, however, and because Ram and Thakur have not proven by a preponderance of the evidence that any of the Defendants discriminated against them because of their Indian national origin, or that any of the Defendants otherwise unlawfully retaliated against them, the Court will find for the Defendants' on each of Ram's and Thakur's claims.

## PROCEDURAL HISTORY

Ram and Thakur filed the operative complaint in this law suit on December 11, 2006.  See Plaintiffs Ram and Thakur's Third Amended Complaint for Damages Related to Employment and Civil Rights Claims, filed December 11, 2006 (Doc. 84).  Ram's and Thakur's Complaint raised the following claims: (i) a claim for race discrimination based on a theory of disparate impact under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, against the NMED; (ii) a claim for race discrimination based on a theory of disparate impact under the New Mexico Human Rights Act, N.M. Stat. Ann. §§ 28-1-1 to -15 ("HRA"), against the NMED and Goodyear; (iii) a claim for

race discrimination based on a theory of disparate treatment under Title VII against the NMED; (iv) a claim for race discrimination based on a theory of disparate treatment under the HRA against the NMED, Jerabek, and Goodyear; (v) a claim for race discrimination based on harassment and hostile work environment under Title VII against the NMED; (vi) a claim for race discrimination based on harassment and hostile work environment under the HRA against the NMED, Jerabek, and Goodyear; (vii) a claim for unlawful retaliation under Title VII against the NMED; (viii) a claim for retaliation under the HRA against the NMED, Jerabek, and Goodyear; (ix) a constitutional equal-protection claim under 42 U.S.C. § 1983 against Jerabek and Goodyear; and (x) a claim for violation of First Amendment rights under 42 U.S.C. § 1983 against Jerabek and Goodyear.

The Court tried the Ram's and Thakur's claims before a jury from December 18, 2006 through January 5, 2007.  See Clerk's Minutes at 1, filed June 27, 2007 (Doc. 171).  The parties concluded the presentation of the evidence on January 3, 2007, and the jury was excused for deliberations at that time.  After two days of deliberations, on January 5, 2007, the jury informed the Court that it was unable to reach a verdict, and the parties agreed to excuse the jury.  See id. at 33 On January 16, 2007, the parties entered into a Stipulation by which they waived their right to a jury trial and agreed to accept the Court's decision based on the same evidence presented to the jury.  See Stipulation at 1.

## FINDINGS OF FACT

1.      Ram and Thakur were born in India and are of Indian National Origin.  See Transcript of Trial at 75:3-5 (Thakur)(taken December 19, 2006)("Dec. 19 Transcript");[2] Transcript of Trial at

---

[2]The Court's citations to the transcript of the trial refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

235:14 (Ram)(taken December 21, 2006)("Dec. 21 Transcript").  Ram was born on October 23,

1937.  See Dec. 21 Transcript at 236:6 (Ram).  Thakur was born on June 23, 1942.  See Dec. 19

Transcript at 96:25 (Thakur).  Thakur is a United States citizen.  See id. at 99:21-23 (Thakur).

      2.      The NMED is a state agency charged with the administration of environmental laws

and the performance of governmental and regulatory functions associated with the environment.  See

N.M. Stat. Ann. § 9-7A-3.  The Environmental Protection Division ("EPD") of the NMED includes

four bureaus: (i) Air Quality; (ii) Solid Waste; (iii) Petroleum Storage Tanks; and (iv) Occupational

Health and Safety.  See Transcript of Trial at 280:16-22 (Norton)(taken December 27, 2006)("Dec.

27 Transcript").  Jim Norton is the Director of the EPD.  See id. at 280:13-14 (Norton).

      3.      The Air Quality Bureau ("AQB") consists of four program groups: (i) Enforcement;

(ii) Planning and Policy; (iii) Operations; and (iv) Permit Programs.  Goodyear is the Permit Programs

Manager.  See Dec. 19 Transcript at 108:20-24 (Thakur).

      4.      The Permit Programs group consists of three sections: (i) New Source Review

("NSR") permitting; (ii) Title V permitting; and (iii) a combined NSR/Title V Permitting section.  See

id. at 108:5-7; 109:2-3 (Thakur).

      5.      Jerabek has been the Title V supervisor since October 1997.  See Transcript of Trial

at 248:9-10 (Jerabek)(taken December 22, 2006)("Dec. 22 Transcript").  Immediately before being

promoted to Title V supervisor, Jerabek had worked for five years as a permit engineer/environmental

specialist in the NSR section of the AQB.  See id. at 246:4-5 (Jerabek).

      6.      Jerabek's duties include: (i) development and implementation of the budget and new

programs; (ii) maintaining and improving existing programs to fulfill the requirements of the federal

and state clean air statutes and regulations; (iii) conducting public hearings to inform the public and

resolve permit issues; (iv) supervising and evaluating five Title V permit engineers; (v) providing oversight and training on program procedures, guidelines, agency policies, and regulations; and (vi) ensuring Title V permits are technically correct and timely issued.  See Defendants' Exhibit EF, Standards for Evaluating Performance of Permit Managers.

7.     When Jerabek was promoted to Title V supervisor, he took the place of the previous-manager, Richard Ezeanyim.  See id. at 248:25-249:1 (Jerabek).  Ezeanyim was promoted to the position of Environmental Engineer II and received a pay increase; Jerabek supervised Ezeanyim in his new position.  See Transcript of Trial at 277:19-278:6 (Jerabek)(taken December 26, 2006)("Dec. 26 Transcript").  Ezeanyim is from Nigeria.  See Dec. 20 Transcript at 100:22-101:1 (Thakur).

8.     There are five permit engineer positions in the Title V Permitting section.  See Dec. 26 Transcript at 96:12-14 (Jerabek).  Ram held a Title V permit engineer position from 1996 until he was terminated in August 2005.  See Dec. 22 Transcript at 149:6-8; 171:1-3 (Ram).  Thakur joined the Title V group in 1997, and he remains in his position. See Dec. 19 Transcript at 106:23-24 (Thakur).

9.     The Clean Air Act and the New Mexico regulations that implement the Act require entities with a potential to emit more than prescribed amounts of pollutants to apply for Title V permits.  See 42 U.S.C. § 7412(a)(1); Rule 20.2.70.7(Q) NMAC.  Title V permits set forth standards and enforceable limitations on an entity's emissions, and include periodic reporting, monitoring, and record-keeping obligations.

10.     In June 1991, Ram was hired into the Water Division of the NMED.  See Dec. 21 Transcript at 242:11-15 (Ram).  On July 5, 1992, Ram tranferred into the Constructions Programs Bureau ("CPB"), an entity within the Administrative Services Division of the NMED.  See id. at

243:17 (Ram).  Thakur joined the NMED in 1990.  See Dec. 19 Transcript at 70:16-18 (Thakur).

Thakur worked in the CPB until July 1997.  See id. at 104:19-23 (Thakur).

11.     While employed at the CPB, Ram filed a Union grievance against his CPB supervisor; Ram contended that he was suspended after his supervisor had falsely accused him of soliciting a letter of appreciation from a project manager in Red River, New Mexico.  See Dec. 21 Transcript at 247:2-20 (Ram).  Robin Gould, a union advocate who works for the New Mexico Department of Cultural Affairs, represented Ram in this matter.  See id. at 247:23 (Ram).  The matter was settled in 1996 by transferring Ram from the CPB to the AQB.  See id. at 249:7-23 (Ram).  In November 1998, Ram filed an administrative complaint against the CPB alleging that he was denied a promotion on the basis of his national origin.  See Dec. 22 Transcript at 196:19-21 (Ram).

12.     At the time Ram joined the AQB, there were eight Indian engineers employed in the Bureau.  See id. at 9:5-6 (Ram).

13.     During his employment at the CPB, the Governor of the Pojoaque Pueblo requested that Thakur be removed from a project involving the Pueblo because of Thakur's inadequate work performance, and that he not be assigned to Pueblo projects in the future.  See Dec. 21 Transcript at 11:5-16 (Thakur).   Grant County Manager, Luis Caldozo, complained that Thakur was uncooperative and caused project delays and requested that Thakur not be assigned to future County projects.  See id. at 11:17-19; 12:5 (Thakur).  In response to these complaints, Thakur's supervisor assigned him a "needs improvement" rating on his performance review.  See id. at 14:1-3 (Thakur).  Thakur filed a Union grievance objecting to this rating, and the performance review was eventually revised.  See id. at 14:3-8 (Thakur).

14.     In February 1998, Thakur filed an administrative claim against the CPB alleging

retaliation for the exercise of his First Amendment rights in the form of a failure to promote, assignment of a disproportionate workload, a hostile work environment, and unduly critical performance reviews.  See id. at 6:15-19 (Thakur).  In August 1999, Thakur filed a lawsuit against the CPB in federal court alleging employment discrimination on the basis of race, religion, sex, and national origin.  See id. at 4:2-4; 4:14 (Thakur).  Thakur's federal lawsuit was dismissed in January 2000.  See Thakur v. New Mexico, No. 99-CV-956 LH/LCS (D.N.M. 1999), Order Quashing Order to Show Cause, filed January 13, 2000 (Doc. 8)(Smith, M.J.).

15.     Jerabek supervised Ram from October 1997 through August 2005.  Jerabek has supervised Thakur since October 1997 and continues to supervise him.  During this time period, the other three Title V permit positions were either vacant or were filled by: (i) Richard Ezeanyim; (ii) Dario Rocha; (iii) Robert Simpson; (iv) Joseph Kimbrell; (v) Rhona Payne; and (vi) Imam Imamuddin. Jerabek supervised all of these individuals.  Ram, Thakur and Imamuddin were the only three employees to have worked under Jerabek's supervision during this entire period.  See Dec. 22 Transcript at 170:22-24 (Ram).  Imamuddin is from Bangladesh.  See Dec. 19 Transcript at 93:8-11 (Thakur).

16.     In July 1997, AQB management submitted a "'Fear and Exclusion' Survey" to department employees.  See Plaintiffs' Exhibit 59, "Fear and Exclusion" Survey; Dec. 21 Transcript at 86:19-87:1 (Shively).  The purpose of the survey was "to determine whether or not fear of retaliation is a problem in the Bureau and if so, how severe the problem is."  Fear and Exclusion Survey at 1.  The results of that survey were not shared with AQB staff nor do they appear to have influenced AQB managers who assumed positions subsequent to the survey being conducted.  See Dec. 21 Transcript at 113:8-11 (Shively); Dec. 27 Transcript at 186:10-14 (Ely).

17.     On October 20, 1998, Ram sent a memorandum to Jerabek expressing his concern regarding Jerabek's written correction on a proposed permit Ram submitted.  See Defendant's Exhibit DD, Memorandum from Bhanu P. Ram to Ned Jerbek [sic] (dated October 20, 1998).  Ram explained that the point of correction had not been previously communicated to the permit engineers, and that, because of this "lack of communication," he "should not be given such unwanted and inappropriate remarks."  Id.  Ram asserted that the permit engineers' "efforts will be more productive and timely if a uniform Performance Appraisal Standard is enforced and practiced without any type of **Discrimination**."  Id. (emphasis in original).  Jerabek met with Ram to discuss the concerns Ram expressed in his October 20, 1998 memorandum and held a staff meeting to clear up points of confusion.  See Dec. 27 Transcript at 85:22-25 (Jerabek).  Jerabek assigned the permit that was the subject of Ram's memorandum an overall rating of "meets."  See id. at 86:19-20 (Jerabek).

18.     During the eight years Jerabek supervised Ram, Ram often complained when Jerabek corrected his work or offered critical remarks, and Ram frequently used the word "discrimination" in these complaints.

19.     Jerabek applied the same performance appraisal standards to all of the staff he supervised.

20.     In 2000, the NMED incorporated Equivalent Application Final Actions ("EAFA") scores into the job assignment component of permit engineers' performance reviews.  An EAFA score is automatically assigned to each Title V or NSR permit, taking into account the nature of the applicant's facility and the complexity of the work the permit required.  See Transcript of Trial at 143:21-24 (Stafford)(taken December 18, 2006)("Dec. 18 Transcript").  The staff in the NSR and Title V sections were responsible for assigning EAFA point values to the various facilities for which

the sections completed permits.  <u>See</u> Transcript of Trial at 178:21-179:3 (Goodyear)(taken December 28, 2006)("Dec. 28 Transcript").

21.     The EAFA concept was instituted as an objective measure to assess the engineers' performance and workload.  Then AQB Bureau Chief, Sandra Ely, personally approved the implementation of the EAFA system.  <u>See</u> Dec. 27 Transcript at 151:14-16 (Ely).

22.     A typical administrative amendment to a permit can be completed in approximately one hour.  <u>See</u> Dec. 26 Transcript at 131:21-23 (Solomon).  A typical acid rain permit can be completed in four to six hours.  <u>See</u> <u>id.</u> at 131:24-25 (Solomon).  A typical minor modification to a permit can be completed in one to two days.  <u>See</u> <u>id.</u> at 132:4-6 (Solomon).  Permit engineers received an average of 0.25 EAFA points per permit for these assignments.  A Title V permit for a major refinery can take up to two years to complete.  <u>See</u> <u>id.</u> at 133:8-9 (Solomon).  A typical EAFA score for such work might be three points.  <u>See</u> <u>id.</u> at 133:3-5 (Solomon).

23.     Jerabek stated that the EAFA system "could be improved."  <u>See</u> <u>id.</u> at 33:23 (Jerabek).  Jerabek indicated that, with regard to the number of EAFA points an engineer received for simple permits versus complex permits, "there's probably a need to reevaluate the EAFA [system]."  <u>Id.</u> at 45:22-46:17 (Jerabek).

24.     The more complex permits were assigned to the most experienced members of the Title V section.  <u>See</u> <u>id.</u> at 25:1-6 (Jerabek).  Less experienced permit engineers were often assigned simpler permits to "get [their] feet wet."  <u>Id.</u> at 25:8-12 (Jerabek).  <u>See</u> Dec. 18 Transcript at 217:3-6 (Stafford).  Administrative amendments, among the simplest permit work, were typically assigned to the permit engineer who had performed the latest permitting work for the facility.  <u>See</u> Dec. 26 Transcript at 41:1-5 (Jerabek).  The work that Ram and Thakur performed at the AQB was generally

-9-

more complex and technically demanding than the work assigned to most other permit engineers.  See id. at 26:18-21 (Jerabek).  Because managers have authority to assign permit assignments to specific engineers, the EAFA system can be manipulated to effect an employee's performance evaluation negatively.  See id. at 134:5-8 (Solomon).

25.     The system for assigning permits depressed the EAFA scores of Ram and Thakur. Because Ram and Thakur were among the most experienced Title V engineers, and therefore consistently received more complex permits, they were unable to accumulate high EAFA scores by completing numerous simple permits.

26.     Managers have discretion to adjust an employee's EAFA score to reflect properly the employee's permit workload.  See id. at 138:1-6 (Solomon).  Jerabek has reduced the amount of EAFA credits assigned to permit engineers who received a significant portion of their EAFA points from overly simple permits to reflect more accurately the work all the engineers in the department accomplished.  See id. at 47:11-23 (Jerabek).

27.      Ram received overall ratings of "exceeds" in the job competencies portions of his 1999 and 2001 performance reviews.  Defendants' Exhibit K, Employee Performance Appraisal and Development at 6 (dated June 16, 1999); Defendants' Exhibit O, Employee Performance Appraisal and Development at 6 (dated June 13, 2001).  Ram received overall ratings of "meets" in the job competencies portions of his 2000 and 2002 performance reviews.  Defendants' Exhibit M, Employee Performance Appraisal and Development at 6 (dated June 12, 2000); Defendants' Exhibit P, Employee Performance Appraisal and Development at 6 (dated November 13, 2002).

28.     Ram testified that, at least through "2002[,] and even after that," he would often review his work with Ezeanyim before submitting a permit to Jerabek for review. Dec. 22 Transcript

at 175:1-10 (Ram).

29.     Thakur received overall ratings of "meets" in the job competencies portions of his 1999-2002 performance reviews.  See Defendants' Exhibit AG, Employee Performance Appraisal and Development at 7 (dated August 12, 1999); Defendants' Exhibit AI, Employee Performance Appraisal and Development at 7 (dated August 8, 2000); Defendants' Exhibit AK, Employee Performance Appraisal and Development at 7 (dated August 13, 2001); Defendants' Exhibit AN, Employee Performance Appraisal and Development at 4 (dated November 15, 2002).

30.     On August 15, 2001, Ram sent a memorandum to Jerabek indicating that he signed his performance review under pressure, because he could "not take stress just three months after my Open Heart Surgery."  Plaintiffs' Exhibit 164, Memorandum from Bhanu P. Ram to Ned Jerabek (dated August 15, 2001)("Ram's August 15, 2001 Memorandum").  Ram asserted that he had been assigned ten "transit permits" against three or four assigned to other permit writers, and alleged that this discrepancy was "injustice, discrimination and harassment."  Id.

31.     Ram's medical history includes insulin dependent diabetes, hypertension, high cholesterol, and significant gastrointestinal problems.  See Dec. 20 Transcript at 151:16-152:13 (Fletcher).  In April 2001, Ram had quintuple bypass heart surgery to correct a coronary artery blockage and to prevent a future heart attack.  See id. at 111:3 (Fletcher).  Before and after the heart surgery, Ram had episodic angina, which he treated with nitroglycerin pills, patch, and/or spray.  See id. at 113:21-114:1 (Fletcher). Ram acknowledged that, after heart surgery in April 2001, there were significant restrictions on his ability to perform his job.  See Dec. 22 Transcript at 25:1-16 (Ram).

32.     Dr. Ned Siegel diagnosed Thakur with an adjustment reaction, characterized by anxiety and depressed mood swings.  See Dec. 26 Transcript at 183:18-20 (Siegel).  Dr. Siegel

-11-

explained that Thakur's symptoms include being self-involved, constant worry about himself, anxiety, loss of self-confidence, and suspicion of others.  See id. at 193:22-25 (Siegel).

33.     In a memorandum dated September 10, 2001, Ram, Thakur, and Imamuddin expressed their dissatisfaction with the Title V permit section's performance appraisal policy.  See Plaintiffs' Exhibit 35, Memorandum from Bhanu Ram, Imam Imamuddin, and Mahesh Thakur to Sandra Ely (dated September 10, 2001)("September 10, 2001 Memorandum").  In the memorandum, Ram, Thakur, and Imamuddin complained that Simpson had been promoted, and alleged that "[w]e have observed that our performance is evaluated with different standards -- one for Imam, Bhanu and Mahesh, and the other for Bob alone."  Id. at 1.  The memorandum also asserted that, although the department office secretary was required to review all outgoing correspondence, "she has been seriously doing her job only for three of us . . . and not for Bob."  Id. at 2.  The memorandum concluded that "this means either she does not do her job properly, or she treats us differently, or she has been asked to do so."  Id.  Thakur stated that he believed that Simpson's correspondence was not reviewed, because he discovered an error on at least one letter.  See Dec. 21 Transcript at 33:24-34:3; 35:25-36:3 (Thakur).  The memorandum does not expressly assert that any discrepancy in treatment is based on national origin.  See September 10, 2001 Memorandum.

34.     Jerabek, Goodyear, and Ely met in response to the memorandum.  See Dec. 27 Transcript at 68:3-6 (Jerabek).  After that discussion, Jerabek explained to Ram, Thakur, and Imamuddin that Simpson had applied for a distinct position in the NSR section and that no advanced positions existed in the Title V section.  See id. at 72:18-24 (Jerabek).

35.     The requirement that the office secretary review outgoing correspondence was a department-wide, quality assurance measure.  See id. at 167:8-14 (Jerabek).  Corrections that the

department secretary made to permit engineers' correspondence were not considered in Jerabek's review of engineers' performance.  See id. at 75:19-76:3 (Jerabek).

36.     Ely was the AQB Bureau Chief from 1999 through May 2005.  See id. at 148:20-22 (Ely).  Ely was Goodyear's immediate supervisory.  See id. at 150:18-19 (Ely).  In her capacity as Bureau Chief, Ely reviewed and approved personnel decisions such as hiring, firing, discipline, promotions, salary increases, and transfers.  See id. at 150:24-25; 151:3-5 (Ely).

37.     Ely received the memorandum, dated September 10, 2001, from Ram, Thakur, and Imamuddin regarding what they perceived to be unfair AQB policies.  See September 10, 2001 Memorandum.  Ely interpreted this memorandum to express the authors' dissatisfaction with the promotion of Simpson, their belief that they each were entitled to advanced positions, and their perception that the section's administrative assistant reviewed their correspondence, but not Simpson's.  See Dec. 27 Transcript at 163:18-20; 164:20-23; 167:1-7 (Ely).  Ely did not interpret the September 10, 2001 memorandum to convey a complaint of discrimination based on national origin.  See id. at 168:13-15 (Ely).

38.     On September 17, 2001, Ely met with Ram, Thakur, Imamuddin, Jerabek, and Goodyear to discuss the memorandum.  See Defendants' Exhibit DW, E-mail from Ned Jerabek to Bahnu Ram, Imamuddin Imam, Mahesh Thakur (dated September 11, 2001).  At that meeting, Ely discussed the limitations of the state salary system, and explained how Ram,Thakur, and Imamuddin could apply for raises.  See id.  Raises in the state system are contingent upon legislative approval of agency budgets, and frequently require employees to apply for and receive advanced positions.  See Dec. 27 Transcript at 155:6-22 (Ely).

39.     In 2002, the federal Environmental Protection Agency ("EPA") mandated that, by

December 1, 2003, state agencies complete work on Title V permits associated with original applications submitted before January 1, 1996.  See Dec. 19 Transcript at 116:15-19 (Thakur).  These permits were referred to as "transition permits."  Dec. 26 Transcript at 67:9-11 (Jerabek).

40.     In February 2002, the AQB began using new work-management software called TEMPO.  For all permit applications received after August 1, 2002, permit application data must be entered into TEMPO; this data is used to generate the Statement of Basis ("SOB"), which contains the technical analysis for a Title V permit.  Numerous training sessions on the use of the TEMPO system were offered to the AQB staff from 2002 through 2004.  Ram did not actively participate in TEMPO training sessions and did not take initiative to learn how to use the database.  Ram accused at least one of the TEMPO trainers of being incompetent, and admitted that he took permit work with him and worked on permits during the training sessions.  See Dec. 22 Transcript at 198:23-199:6; 199:18-20 (Ram); Dec. 28 Transcript at 122:7-21 (Drapela).

41.     Ram openly made allegations of discrimination in department procedures in at least two staff meetings, including a meeting on October 9, 2002, and another on July 9, 2003.  See Transcript of Trial at 61:18-62:17 (Thakur)(taken December 20, 2006)("Dec. 20 Transcript").  Ram was frequently disruptive at staff meetings, and would accuse co-workers and supervisors of inappropriate conduct.  See Dec. 28 Transcript at 117:19-23 (Drapela).

42.     Drapela and Jerabek held combined weekly staff meetings for both of their sections and staff members.  See Dec. 21 Transcript at 93:15-16 (Shively).  On October 1, 2002, Ram accused colleague Trais Kliphuis of "boogering up" the TEMPO database and of being incompetent in her role as a TEMPO trainer.  See Defendants' Exhibit BF, Memo from Ned Jerabek to File Concerning Staff Treating Each Other With Professionalism and Respect (dated October 29, 2002).  Ram also

-14-

repeatedly complained that Simpson unjustifiably received a raise when he returned to the Title V

Section and that Simpson's alleged raise constituted discrimination against Ram.  See id.  In response

to these statements, Ram and Jerabek met at Jerabek's desk, and Jerabek instructed Ram not to attack

his colleagues verbally and to treat his peers with professionalism and respect.  See id.; Dec. 27

Transcript at 78:20-24 (Jerabek).  At a staff meeting on April 15, 2003, Ram accused Drapela of

treating Lawrence Alires, a permit engineer in Drapela's section, unfairly and stated that Drapela

would always give Alires a "Needs Improvement" rating regardless of what criteria was used to

review permit files.  Defendants' Exhibit BN, Memo to File (dated April 15, 2003); Dec. 22

Transcript at 201:23-202:4 (Ram).  Alires still works at the AQB under Drapela; Alires has been

promoted and advanced.  See Dec. 22 Transcript at 202:6-11 (Ram).

43.     In July 2003, Jerabek sent an e-mail to all permit engineers instructing that all permits

must be developed from the current permit template in the computer system.  See Defendants' Exhibit

BH, E-mail from Ned Jerabek to Permit Engineers (dated July 9, 2003).  Jerabek informed the permit

engineers that permits developed using an old permit as a template would be immediately returned

with a "needs improvement" rating.  Id.

44.     Thakur testified that permit engineers were required to make corrections to permits

even if the templates in the computer system had been modified after the draft permit had been

submitted to the engineer's supervisor for review.  See Dec. 21 Transcript at 144:17-18 (Thakur).

All the engineers in the Title V section, Indian and non-Indian, were subject to this requirement.  See

id. at 144:19-22 (Thakur).

45.     In response to Jerabek's e-mail regarding the use of permit templates, Ram sent an

e-mail to all AQB employees criticizing the templates and suggesting that new templates should be

developed with the participation of permit writers.  See Defendants' Exhibit BH, E-mail from Bhanu P. Ram to Ned Jerabek (dated July 9, 2003).  Ram contended that the AQB's "research scholar" misunderstood the current template in assigning him a needs improvement rating on a recent permit and alleged that changes in the templates were issued "to make an excuse to give 'NEEDS IMPROVEMENTS' to the actual permit writers."  Id. (capitalization in original).  See Dec. 22 Transcript at 30:16-31:3 (Ram).  Jerabek believed that, when Ram referred to the AQB's "research scholar," Ram was referring to Kimbrell.  See Dec. 27 Transcript at 108:19-23 (Jerabek).

46.     On the same day, Ram responded to an e-mail from Mary Uhl, then Manager of the Modeling Section and current AQB Bureau Chief, representing that, "in this [Title V] section, there is a contineous game of preditors and pray.  game is skillfully played to reward and recognise/ punish the employee of certain class by giving NEEDS IMPROVEMENT."  Defendants' Exhibit BI, E-mail from Bhanu Ram to Mary Uhl (dated July 9, 2003)("Ram's E-mail to Uhl").  Ram explained that the "class" to which he referred were "those who speak truth."   Dec. 22 Transcript at 36:5-6 (Ram). Ram asserted that this policy was "the main reason of high turnover in permit section."  Ram's E-mail to Uhl.  Ram stated it was his belief that he, Thakur, and Imamuddin had issued 80% of the Title V permits, and that 95% of those permits had received "needs improvement" ratings.  Id.  At trial, Ram admitted that this last allegation may be incorrect.  See Dec. 22 Transcript at 220:8 (Ram).

47.     In his e-mail to Uhl, Ram provided four examples of perceived mistreatment of permit engineers: (i) that his ratings in the "job knowledge" competency portion of his performance evaluation had declined from "exceeds" in 1999 to "needs improvement" without explanation; (ii) that only himself, Thakur, Ezeanyim, and Imamuddin were advised to have the AQB office secretary, Robyn Reed, review and correct their letter correspondence; (iii) that Ezeanyim had been hired as a

consultant to write Title V permits; and (iv) that documentary evidence indicated that a particular permit was evaluated with a "meets" rating and then subsequently reviewed again. See Ram's E-mail to Uhl.

48.     Jerabek drafted a written response to Ram's allegations. See Defendants' Exhibit BJ, Memorandum from Ned Jerabek to Bhanu Ram (dated July 18, 2003)("July 18, 2003 Memorandum"). Jerabek explained that, although current permit templates must be used, template changes made after a permit has been submitted for review are not considered for the purpose of the quality review rating. See id. at 3. Jerabek noted that changes to the templates were discussed at staff meetings, and therefore all the AQB permitters had an opportunity to make recommendations and provide feedback. See id. In his response, Jerabek advised Ram that his reference to certain staff as "research scholars" was inappropriate and offensive to those employees. Id. at 4. Jerabek countered Ram's contentions regarding his job knowledge ratings and noted that, beginning in July 1998, Ram had consistently received ratings of "meets" or "exceeds" in the job knowledge category. Id. at 4-5. Jerabek explained that Reed reviewed all correspondence as a quality assurance measure, and confirmed that Ezeanyim received a contract to complete a permit that was previously assigned to him before he left the AQB. See id. at 5. Jerabek also calculated that, since 1998, 23.2% of the permits that Ram, Thakur, and Imamuddin completed received a "needs improvement" rating. See id.; Defendants' Exhibit CF, Ned Jerabek's Handwritten Notes.

49.     Jerabek discussed his written response with Goodyear and Ely, and, in accordance with their advice and instruction, Jerabek issued Ram a letter of reprimand for disrespecting fellow employees and unprofessional behavior. See July 18, 2003 Memorandum; Defendants' Exhibit FB, E-mail from Richard Goodyear to Ned Jerabek (dated July 16, 2003). In the letter of reprimand,

Jerabek notes that Ram had "been counseled twice in the past concerning the inappropriateness of making derogatory remarks about other staff and making unsupported accusations of discrimination in staff meetings." July 18, 2003 Memorandum at 1. The July 18, 2003 Memorandum referenced an October 9, 2002 permit section meeting during which Ram alleged that management manipulated the performance evaluation review system for purposes of racial discrimination and stated that he had documents to substantiate that allegation. See id.; Dec. 22 Transcript at 33:13-16 (Ram); Dec. 27 Transcript at 96:1-4 (Jerabek). Although Goodyear invited Ram to present any documents for discussion and possible resolution, Ram did not present any evidence to management. See July 18, 2003 Memorandum.

50.     Despite the language of Ram's complaints, Jerabek did not consider them to be related to racial discrimination. See Dec. 27 Transcript at 98:3-4 (Jerabek). Jerabek indicated that Ram had complained frequently in the past, that he was not, at that time, functioning well in the office, and that he was "looking for excuses to blame the process or other people for his lack of performance." Id. at 98:6-9 (Jerabek).

51.     In the summer of 2003, shortly after Norton took over the EPD, Ram and Thakur met with Norton to express their dissatisfaction with what they perceived to be Goodyear's dictatorial management style and his bias towards industry. See Dec. 27 Transcript at 284:21-23 (Norton). In their meeting with Norton, Ram and Thakur did not allege that they had been discriminated against because of their national origin. See id. at 284:20 (Norton). Norton contacted Cliff Hawley, then Personnel Bureau Chief, and Ely to investigate the charges. See id. at 285:5-9 (Norton). Hawley informed Norton that Ram and Thakur had previously had some performance problems, and that they were among a group of employees that had historically "filed a lot of grievances and complaints and

-18-

lawsuits and that sort of thing." Id. at 285:14-19 (Norton).  Hawley also told Norton that Ram and

Thakur had been moved to the AQB after having performance problems in the CPB.  See id. at

285:22-286:3 (Norton).  Both Hawley and Ely also told Norton that Goodyear was a thorough,

conscientious manager, and maintained that he was not biased.  See id. at 286:8-12; 286:17-21

(Norton).

52.     In August 2003, Ram, citing health reasons, requested a transfer to a less stressful

position.  See Dec. 22 Transcript at 91:1-3 (Ram).  In a letter to Hawley dated August 7, 2003, Ram

stated that he was under stress in his current position under Goodyear.  See Plaintiffs' Exhibit 31,

Letter from Bhanu P. Ram to Cliff Hawley (dated August 7, 2003)("Ram's August 7, 2003 Letter").

Ram sent this letter at the recommendation of Gould, who suggested he request reasonable

accommodation in accordance with the Americans with Disabilities Act.  See Dec. 22 Transcript at

58:25-59:2 (Gould).  Gould is not a lawyer and testified that she is not familiar with the specific

accommodations the law requires.  See id. at 66:21-24 (Gould).

53.     In the letter, Ram referenced several listings for open positions within the NMED that

he maintained matched his qualifications and experience.  See Ram's August 7, 2003 Letter.  Ram

attached a letter from his physician, William M. Davies, M.D., discussing his symptoms, and a copy

of his resume.  See Plaintiffs' Exhibit 231, Letter from William M. Davies, M.D. to Ronald Curry

(dated July 28, 2003) & Resume of Bhanu P. Ram.  On August 14, 2003, Norton and Ronald Curry,

Cabinet Secretary for the NMED, met with Ram; Norton followed up this meeting with a letter dated

August 26, 2003, requesting that Ram identify the job functions he was unable to perform and

encouraging Ram to apply for other available positions.  See Plaintiffs' Exhibit 31, Letter from James

Norton to Bhanu Ram (dated August 26, 2003).  Ram responded with a letter requesting that he be

transferred immediately and explaining that he was "totally capable to perform [his] assignments provided that [he was] removed from the stressful work environment which precipitate[s] life threatening situation[s]."  Plaintiffs' Exhibit 31, Letter from Bhanu P. Ram to James Norton (dated September 4, 2003).  Ram's physician provided a letter concurring with Ram's assessment:

> In discussion with Mr. Ram and review of his medical conditions, there are no specific physical accommodations or concessions that need to be made.  It is primarily reducing highly stressful situations both due to work and interpersonal relationships.  Very stressful situations cause increased blood pressure and increasing angina.  Whatever adjustments or accommodations made to provide Mr. Ram with a work environment that is less stressful than his current position would be appreciated.

Plaintiffs' Exhibit 31, Letter from William Bacon, P.A. to Ronald Curry (dated August 27, 2003).

54.    Norton and Ely offered Ram the Employee Assistance Program and workplace mediation to help reduce his stress.  See Plaintiffs' Exhibit 31, Letter from Jim Norton to Bhanu P. Ram (dated September 19, 2003).  In a letter dated September 19, 2003, Norton again encouraged Ram to apply for other positions in the NMED as they became available.  See id.  Norton did not believe there was a less stressful job in the Bureau into which Ram could transfer.  See Dec. 27 Transcript at 290:23-291:7 (Norton).

55.    At approximately the same time, Jerabek approved Ram's request for a month of vacation time, beginning on or about October 1, 2003, so that Ram could travel to India to attend a wedding.  See Dec. 22 Transcript at 222:3-7 (Ram).  At the time Jerabek approved Ram's request, Ram had two remaining transition permits to be issued by the EPA deadline of December 1, 2003.  See id. at 221:22-25 (Ram).  Jerabek approved Ram's vacation request with the expectation that Ram would return to work sometime on or about November 1, 2003.  See id. at 222:21-223:1 (Ram).

56.    On September 23, 2003, Ram and his wife met with Dr. Christopher Fletcher to

receive the vaccinations necessary to travel to India.  See Transcript of Trial at 163:25-164:3 (Fletcher)(taken December 20, 2006)("Dec. 20 Transcript").  Dr. Fletcher's notes indicate that Ram was intending to remain in India for two months.  See id. at 164:4-8 (Fletcher).  Ram indicated that he typically visits India for four to six weeks at a time.  See Dec. 22 Transcript at 226:17-19 (Ram).

57.    On or about November 7, 2003, Jerabek sent an e-mail to Ram in India via an e-mail address that Thakur had provided.  See Defendants' Exhibit CN, E-mail from Ned Jerabek to Bhanu Ram (undated).   Jerabek's e-mail reminded Ram of the December 1, 2003 EPA deadline, informed Ram that Jerabek had reassigned one of the permits, and requested that Ram send him information regarding the location of electronic files related to the other permit.  See id.  Ram sent the following response: "I am not keeping well and under going medical checkup and treatment.  Please grant me sick leave till December 2nd.  I will bring doctor's certificate/ letter along with me."  Id.  Ram returned to the United States on December 1, 2003.  See Dec. 22 Transcript at 226:23 (Ram).

58.    The steps permit engineers are required to complete in processing a permit include: (i) reviewing the permit application for completeness within sixty days of submission, see Defendants' Exhibit DH, Steps in Reviewing an Operating Permit Application ¶ 7E, at 1-2; (ii) entering the application data into TEMPO, see id. ¶ 13E, at 2; (iii) performing technical analysis and preparing a SOB, see id. ¶ 14E, at 3; (iv) drafting the permit for managerial, applicant, and public review, see id. ¶¶ 18E, 20E-21E, at 3; (v) preparing and publishing public notice, see id. ¶ 21E, at 3; (vi) preparing a proposed permit incorporating valid comments and transmitting the proposed permit to the EPA; and (vii) preparing the final permit for managerial authorization, see id. ¶ 34E, at 4-5.

59.    In early 2003, Ram had nine active permits in various stages of review; the average number for permit engineers processing Title V permits was ten.  See Defendants' Exhibit BU,

Memorandum from Ned Jerabek to Bhanu Ram at 1 (dated May 5, 2004)("May 5, 2004 Letter of

Reprimand").  By the end of 2003, of those permits assigned to Ram, he had closed one transition

permit, one transition permit on which he had not completed any work was reassigned to another staff

member, one transition permit was transferred to another engineer at the proposal stage because of

his extended stay in India, and Ezeanyim, working as an independent contractor, had already

completed the SOB and draft permit on another transition permit.  See id.; Dec. 22 Transcript at

180:18-20 (Ram).  Jerabek indicated that, during this period, he worked extensively with Ram on the

transition permits -- to ensure that the transition permits were issued before the December 1, 2003

EPA deadline -- as well as on two of the renewal permits and an acid rain permit.  See May 5, 2004

Letter of Reprimand.

      60.    Ram received an overall rating of "needs improvement" in his 2003 review.  See

Defendants' Exhibit R, Employee Performance Appraisal and Development at 5 (dated December 11,

2003)("Ram's 2003 Review").  Ram refused to sign his 2003 performance appraisal when it was

presented to him upon his return from India in December 2003.  See id.

      61.    In the six competency categories evaluated as part of his 2003 performance review,

Ram received one "meets," four "needs improvement," and one "unacceptable" rating.  Ram's 2003

Review at 5.  Jerabek articulated the basis for each of the needs improvement and unacceptable

ratings.

    Competency 1: Organizational Awareness (Needs Improvement)

    Supervisor Comments: Organizational Awareness: Identifies surface structure and
    informal relationships of Bureau, but does not align behavior with Bureau mission and
    consequently seems that he does not accept what the Bureau defines as important.
    Example -- Had to reassign the Milagro permit, P101, and re-create all the review
    work that was done in July in order to meet the EPA deadline for issuing transition

permits.

Competency 2: Communication (Needs Improvement)

Supervisor Comments: Communication: Does not seek to understand others from their own frame of reference. Has made derogatory remarks about staff both in staff meetings and in global e-mails to the entire Bureau in violation of Bureau Policy as noted in July 18, 2003 Letter Of Reprimand.

Competency 3: Personal Skills (Unacceptable)

Supervisor Comments: Personal Skills: Does not maintain ethical standards of honesty and integrity as noted in July 18, 2003 Letter Of Reprimand. The July 18, 2003 letter is in response to Mr. Ram's Bureau wide global e-mail of July 9, 2003 and the July 18, 2003 letter documents inaccurate and false statements by Mr. Ram. Has difficulty managing stress and keeping disruptive impulses in check.

Competency 5: Analytical Thinking (Needs Improvement)

Supervisor Comments: Analytical Thinking: Uses knowledge from past permits and applies it to new permits, but does not follow the proper permit review procedure. Also notices when a current situation is similar to a past situation, and identifies the similarities, but does not do the research to identify how these situations apply to state and federal regulation. This is evidenced by the lack of details in the "Justification For Use" section of the Statement Of Basis (SOB). During the review of permit applications he repeatedly fails to develop a complete and thorough written statement of basis (SOB) and then fails to develop the draft permit based on that document. After final permits are signed and all data entries are made he repeatedly fails to transfer all permitting documents to the electronic archive.

Competency 6: Use of Technology (Needs Improvement)

Supervisor Comments: Uses Technology: Is not maximizing productivity by using technology in an appropriate and efficient manner. Four folders in Fates/Title V/Title V-Permits do not contain properly archived documents. These permits were all issued during this PAD review period. P214A contains no archived documents; P149 is missing the completeness letter, public notice, proposed permit and final permit; P012M3 contains the mis-filed document P018-RI-Rul, and no folder has been created nor documents archived for P012M4; and P056R1 contains no archived documents. All the following permits issued during this PAD review period do not have any AI/SI data entered into TEMPO nor have any document files been attached to TEMPO: P012M3, P012M4, P149, P083, P056R1, P099R1, P133R1, and P214A. Product quality also suffers due to inappropriate use of old permits as templates. This

-23-

is evidenced in P056-R1 and P099-R1 where the first sentence of the draft permits references the Bureau as the "Air Pollution Control Bureau."

Id. at 7-8.

62.     In the six competency categories evaluated as part of his 2003 performance review, Thakur received two "meets," three "needs improvement," and one "unacceptable" rating. Defendants' Exhibit AP, Employee Performance Appraisal and Development at 5 (dated October 30, 2003).  Jerabek articulated the basis for each of the needs improvement and unacceptable ratings.

Competency 1: Organizational Awareness (Needs Improvement)

Supervisor Comments: Organizational Awareness -- Operating permit section goal is to issue all transition permits by 12/1/03.  Requested draft transition permits for P110 and P097 be submitted for review 3/27/03, and proposed by mid May and mid June respectively, and final permits to be submitted by October 10, 2003 to meet the assigned deadline of 11/1/03 for these two permits.  To this date as of October 22 neither draft, proposed, or final for P110 or P097 have been submitted for review. Submitting projects too close to deadline such that it takes major effort to complete final review and forces management to drop high priority transition permit review projects in order to accommodate last minute deadline (example P130-M1).  Identifies surface structure and informal relationships of Bureau, but does not align behavior with Bureau mission and consequently seems that he does not accept what the Bureau defines as important.

Competency 2: Communication (Needs Improvement)

Supervisor Comments: Communication -- Communicates in a way that is understandable and shares information, but does not probe to understand unexpressed or poorly expressed thoughts, concerns, or ideas.  This shortcoming is illustrated by the fact that many of the mistakes that he makes during the permit review process are repeated from one permit to the next despite the supervisor's corrections.  Using old permits as templates is an example of this. Another example of this is the seven times that the permit review checklist rating cites the deficiency of submitting draft permits for review and yet this review step continues to be omitted.

Competency 5: Analytical Thinking (Needs Improvement)

Supervisor Comments: Analytical Thinking -- During the review of permit applications he repeatedly fails to develop a complete and thorough written statement

of basis (SOB) and then fails to develop the draft permit based on that document. After final permits are signed and all data entries are made he repeatedly fails to return permit files to permit filing cabinet and to transfer all permitting documents to the electronic archive.   Documents that have been electronically misfiled, such as documents in File P213A, need to be sorted and correctly filed.  Permit P213A was not closed in accordance with the regulation at 20NMAC 2.70.400.H; in fact no action was taken before the 18 month review deadline expired. At supervisor's direction a formal letter of closure is now being sent out.  When looking at information he sees patterns, trends, or missing pieces, and notices when a current situation is similar to a past situation, but does not demonstrate sophisticated pattern recognition by applying and modifying complex learned concepts.

Competency 6: Use of Technology (Unacceptable)

Supervisor Comments: Uses Technology -- Does not maximize productivity by embracing and using technology in an appropriate and efficient manner to produce a quality product.  He needs to seek out help from knowledgeable staff and other experts when having difficulty implementing new technologies.  Despite repeated assistance, training, and guidance in using his computer to access permitting documents and archives, he is unable to perform basic tasks and functions consistently.  An example occurred Thursday, October 23 when he was unable to log into FATES, where all the permitting templates, monitoring protocols, and archives reside, because he was trying to gain access via password instead of direct mapped access, which all operating permit staff were set up with.  He does not use consistently the electronic files containing current permitting templates and forms. For example the October 2, 2003 review of permit P130M1 indicates an older permit was used as a template instead of using the current permit template residing in FATES.  The permit tracking data base, AIRS JR, is another example where permits P120M2 and P010R1 were ruled incomplete on September 6, 2003, but as of this date, October 24, 2003, no entry has been made in the data base documenting this action.

Id. at 7-8.

63.     Before 2003, AQB employee performance reviews were scored based on a 70% weight for the "job assignments" category and a 30% weight for the "job competencies" category. Dec. 28 Transcript at 182:2-5 (Goodyear).  In 2003, that weighting was adjusted to a 50%/50% ratio to place more emphasis on the permit engineers' professionalism and customer service skills.  See id. at 182:23-183:2 (Goodyear).  Goodyear received approval from the Human Resource Bureau Chief

-25-

and from Ely before making this change.  See Dec. 27 Transcript at 7-11 (Ely); Dec. 28 Transcript

at 183:25-184:3 (Goodyear).  In addition, general complaints about changes in the performance

review policies were discussed in weekly staff meetings during which Goodyear sought staff input.

See Dec. 28 Transcript at 116:7-8 (Drapela)(noting that staff meetings are held every Tuesday).

64.     The new weighting system was applied uniformly to all permit engineers in the Title

V section.  See Dec. 22 Transcript at 68:16-20 (Gould).  Ram and Thakur did not present evidence

sufficient to prove by a preponderance of the evidence that the increased weight applied to job

competencies caused them to receive less favorable reviews in 2003, or that the new weighting

system was applied to Indian permit engineers in a different manner compared to non-Indian permit

engineers.  Ram and Thakur did not prove by a preponderance of the evidence that AQB management

instituted the revised weighting system for the purpose of discriminating against employees of Indian

national origin.

65.     On December 16, 2003, Goodyear and Jerabek met with Ram to notify him that he

was being referred to the Employees Assistance Program to help him deal with his stress and to

address the remarks he had made about other staff members, which management perceived to be

inappropriate.  See Defendants' Exhibit BL, Memorandum from Richard Goodyear to File (dated

December 16, 2003)("Goodyear's December 16, 2003 Memorandum"); Dec. 28 Transcript at

202:15-17 (Goodyear).  During the meeting, Goodyear explained that any changes in evaluation

procedures or increased emphasis on professionalism factors in performance reviews were not an

attempt to retaliate against particular employees, but were implemented in response to Goodyear's

dissatisfaction with overall permit timeliness and quality.  See Goodyear's December 16, 2003

Memorandum.  Goodyear also explained that, unlike in the early years of the Title V program, Title

V managers would no longer work closely with staff on the details of individual permits, and explained that he had instructed Title V managers not to review different versions of the same permit on a line-by-line basis as had been done in the past.  See id.

66.     Ram participated in four counseling sessions to which the Employees Assistance Program referred him.  See Plaintiffs' Exhibit 31, Letter from Susanne Stockman, M.A., L.P.C. to James Norton (dated January 28, 2004).  In a letter to Norton dated January 28, 2004, Ram's counselor, Susanne Stockman, M.A., L.P.C., indicated that Ram "appears to be quite adept at utilizing a number of techniques for stress reduction including yoga, meditation, counting backwards when triggered, exercise and prayer."  Id.  Stockman noted, however, that Ram continues to feel that he is exposed to undue stress in the workplace and that excessive burden is being placed on his heart, placing him at risk of a heart attack.  See id.  Stockman added her support to Ram's request for a transfer to a less stressful position.  See id.

67.     Ram also expressed his desire to be transferred directly to Ely.  See Dec. 27 Transcript at 169:16-22 (Ely).  Ram explained that he had heart bypass surgery in April 2001, suffered from recurring angina, and routinely used nitroglycerin spray.  Ely advised Ram that she had discussed his transfer request with Bentley and Norton, and that they were waiting to hear from Ram's physicians about what type of work environment was required before taking any action.  See id. at 173:22-174:2 (Ely).  Ram expressed an interest in an enforcement position within the AQB, but explained that he had not applied for a recently advertised position because it was a "Basic" position.  Ely also knew that Deborah McElroy was the head of the Enforcement Section and that, when Ram was transferred to the AQB, he refused a position in the Modeling Section, because he did not want to work for a woman.  See id. at 172:12-16 (Ely).  Ram also stated that he had applied for a position in the Field

-27-

Operations Bureau.  Although Ram did not complain about his supervisors, Ely advised him that mediation between him and his supervisors, or anyone else in the Bureau, was available.  See Dec. 27 Transcript at 172:22-173:1 (Ely).

68.     Ram did not prove by a preponderance of the evidence that he was similarly situated to other employees who received transfers during the time the NMED employed him.  Ram did not identify particular positions that were less stressful than his position in the Title V section for which he applied and was passed over in favor of a lesser qualified non-Indian employee.  Ram did not testify regarding the personal circumstances or application processes of any other employees who received transfers during the time the NMED employed him.

69.     On May 5, 2004, Jerabek issued Ram a letter of reprimand alleging poor job performance.  See May 5, 2004 Letter of Reprimand.  The May 5, 2004 letter focused on two permit applications in particular: Permit P018-R1 and Permit P126-R1.  See id. at 1-2.  Goodyear reviewed and approved the May 5, 2004 letter of reprimand.  See Dec. 28 Transcript at 207:20-24 (Goodyear).

70.     In the May 5, 2004 letter of reprimand, Jerabek documented that, on April 5, 2004, he advised Ram that Ram had not performed any work on P018-R1 since February 13, 2003.  See May 5, 2004 Letter of Reprimand at 1; Defendants' Exhibit BS, E-mail from Ned Jerabek to Bhanu Ram (dated April 5, 2004).  At that time, Jerabek instructed Ram to complete the technical analysis and submit a SOB for managerial review by April 30, 2004.  See May 5, 2004 Letter of Reprimand at 1.  When Ram had not submitted a SOB by May 4, 2004, Jerabek approached Ram in his office and requested the SOB, which contained numerous errors.  See id. at 2.  In particular, the SOB was not generated in the TEMPO database and the permit application data was not entered in TEMPO. See id  In addition, rather than construct the SOB from the current template, Ram impermissibly

-28-

modified an old SOB attained from a colleague on April 28, 2004 and submitted it as a current permit. See id. Jerabek observed that the "unacceptable timeliness and quality of [Ram's] submittal [was] at least partially due" to his delay in beginning the project. Id. Ram conceded that he began the work Jerabek requested close to the deadline, but emphasized that he did so because he was working to complete other permits. See Dec. 22 Transcript at 194:7-10 (Ram).

71.     Jerabek noted that the renewal application for Permit P126-R1 was received on January 13, 2004 and assigned to Ram on the following day. See May 5, 2004 Letter of Reprimand at 2. Jerabek observed that Ram had not taken any steps to assess the application's completeness within sixty days of receipt as agency regulations required. See id. Jerabek explained that, pursuant to agency regulations, applications were deemed complete by default if no action was taken within sixty days, and that Ram's conduct contravened instructions frequently repeated in staff meetings, that applications should never be allowed to be deemed complete because of agency inaction. See id. Jerabek also emphasized that Ram had not entered the application data into TEMPO. See id.

72.     On May 12, 2004, when Jerabek and Bentley met with Ram in Jerabek's office concerning the letter of reprimand, Ram indicated to them that he could not go over the letter at that time, because of advice from his doctor. See Defendants' Exhibit BW, Memorandum from Ned Jerabek to File at 1 (dated May 12, 2004)("May 12, 2004 Memorandum"); Dec. 22 Transcript at 107:17-19 (Ram). At the meeting, Ram displayed a great deal of anxiety and put a white patch on his chest. See May 12, 2004 Memorandum; Dec. 22 Transcript at 107:3-8 (Ram). Ram subsequently left Jerabek's office. See May 12, 2004 Memorandum; Dec. 22 Transcript at 107:19-20 (Ram). Jerabek and Bentley left the office together fifteen to twenty minutes later. See May 12, 2004 Memorandum; Dec. 26 Transcript at 82:1-2 (Jerabek). After Jerabek left his office, he noticed Ram

sitting on the floor of Ram's office with his back against the wall; Jerabek entered the office and inquired whether Ram was alright.  See May 12, 2004 Memorandum; Dec. 22 Transcript at 109:7-8 (Ram).  Ram instructed Jerabek to retrieve his medicine from his desk.  See May 12, 2004 Memorandum; Dec. 22 Transcript at 109:9-10 (Ram).  Jerabek handed him the medicine, which Ram sprayed into his mouth.  See Dec. 22 Transcript at 110:24-25 (Ram).  Ram called Thakur and Imamuddin, who both arrived promptly and escorted Ram out of the building.  See id. at 111:20-22 (Ram).

73.     The next day, May 13, 2004, Ely met with Ram to discuss the previous day's incident.  See Dec. 27 Transcript at 176:11-13 (Ely).  Ram explained that Thakur and Imamuddin had taken him home, because he did not want to go to the hospital.  See Dec. 22 Transcript at 110:20-22 (Ram).  Ram's daughter, Varsha Ram, is a physician, and was at home and able to care for him.  See Dec. 26 Transcript at 167:8-168:17 (V. Ram).

74.     On May 17, 2004, Ram's wife and daughter met with Curry to request a transfer for Ram because of his health.  See Dec. 22 Transcript at 127:23-25 (Ram); Dec. 26 Transcript at 170:14-15 (V. Ram).  Curry explained that there was not a less stressful open position into which Ram could be transferred.  See Dec. 27 Transcript at 256:1-11 (Curry).  Neither Ram's wife nor his daughter advised Curry that Goodyear or Jerabek had discriminated against Ram or any other Indian employee based on national origin.  See Dec. 26 Transcript at 177:16-19 (V. Ram).

75.     The next day, May 18, 2004, Curry met with Ram.  See Dec. 27 Transcript at 258:9-10 (Curry).  During this meeting, Ram advised that he had applied for a position in the Española, New Mexico Field Operations Office, that he had been interviewed for the position, and that he expected to be offered the position.  See Dec. 22 Transcript at 130:1-3 (Ram); Dec. 27 Transcript at 258:16-18

-30-

(Curry).  Ram did not indicate to Curry that Goodyear or Jerabek had discriminated against him based on national origin or retaliated against him for exercising his First Amendment rights.  See Dec. 27 Transcript at 260:9-13 (Curry).  Curry contacted Ana Marie Ortiz, Bureau Chief of Field Operations, and learned that Ram was not selected for the position.  See id. at 256:16-19 (Curry).  Ortiz advised Curry that she was not inclined to hire Ram because his productivity in his previous job had been very low.  See id. at 256:20-257:2 (Curry).  Curry was also of the opinion that a job in field operations was more stressful than an AQB permit engineer position because of the need to travel out into the field and meet with citizens who were upset about local environmental situations.  See id. at 255:1-23 (Curry).

76.    In his May 2004 performance review, Ram received a summary rating of "Requires Attention."  Defendants' Exhibit S, Performance Appraisal Summary: FY 2005 General Salary Increase (dated May 28, 2004).  Jerabek cited several reasons for this rating:

> COMMENTS: Permits currently late – P176M2, P066M1, P042R1. Permit P126R1 late on completeness determination. 5/5/04 folder rating for permit P018R1 was "Not Acceptable (no other work submitted for evaluation). 5/5/04 "Letter Of Reprimand" for poor performance. 3/30/04 MEMO documenting Terry Simerson's disappointment in Bhanu's performance. Poor performance utilizing TEMPO data base.

Id.

77.    On May 13, 2004, the applicant for Permit P126-R1 submitted an updated application.  See Defendants' Exhibit CC, P126 Skelly Compressor Station Timeline at 1 (dated September 22, 2004).  On July 8, 2004, Ram sent the applicant notice that the application was complete as of that date, despite Jerabek's earlier directive that Ram send the applicant notice that the application had become complete through AQB inaction on March 13, 2004.  See id.  Jerabek characterized this

notice as an attempt to create "the illusion that the application was ruled complete on time within 60 days of having received the updated application on 5/13/04," and documented Ram's continuing problems with Permit P126-R1:

> [Y]our letter of 7/8/04 declaring the application complete on the same day, 7/8/04, is invalid and contrary to the regulation at 20.2.70.400B. The new application they sent in on 5/11/04 is to be considered additional or addendum information; it does not restart the review process. Therefore, I repeat my earlier instruction -- send the company a letter stating that the 7/8/04 completeness date was in error and the correct completeness date is 3/13/04. Then go into TEMPO and correct the complete date and the application received date. Include a note that an updated application was received on 5/13/04. Please complete these actions by Friday, 8/13/04.

Id. at 1-2.  On August 30, 2004, Ram submitted a revised SOB and draft permit to Jerabek for managerial review.  See id. at 2.  Jerabek noted that Ram had not corrected the inaccurate dates or contacted the applicant with the correct dates, as he had been instructed.  See id.

78.     On October 8, 2004, Norton issued Ram a notice of contemplated action indicating that, because of his failure to comply with the terms of the May 5, 2004 letter of reprimand, the AQB was contemplating suspending him for two days.  See Defendants' Exhibit CD, Letter from Jim Norton to Bhanu P. Ram at 1 (dated October 8, 2004).  Ram's failure to comply with management's instructions resulted in his being suspended without pay for two days in November 2004.  See Defendants' Exhibit CE, Letter from Jim Norton to Bhanu P. Ram (dated November 2, 2004).  Norton was the ultimate decision maker regarding Ram's suspension and presented Ram with the notice of his suspension.  See Dec. 27 Transcript at 292:21-23 (Norton).

79.     Ram received a "not acceptable" rating on his September 2004 performance review. Defendants' Exhibit T, Employee Development and Appraisal at 4.

80.     Because of Ram's "not acceptable" rating on his 2004 annual performance review,

Jerabek developed a Performance Action Plan for Ram that scheduled due dates for submission of the SOB, Draft, Proposed and Final Permits for six permits: (i) P047-R1 (Bitter Lake Compressor Station); (ii) P129-R1 (Pecos River Compressor Station); (iii) P126-R1 (Skelly Compressor Station); (iv) P175-R1 (MCA Tank Battery No. 2); (v) P042-R1 (Star Lake Compressor Station); and (vi) P034-R1 (Decker Junction CDP Compressor Station).  See Defendants' Exhibit U, Employee Development and Appraisal at 6.  Jerabek aimed to have all six permits issued before July 1, 2005 so that they could be credited to Ram in the pending EDA review period.  See id.  In the Performance Action Plan, Jerabek committed to review, correct, assign quality ratings, and return each submitted item within three weeks.  See id. at 7.  In addition, Jerabek committed to maintain an open-door policy to discuss all aspects of the permit application with Ram as-needed, to explain complicated corrections on the reviewed work, and to meet with Ram weekly to ensure his work was being properly prioritized, to review upcoming deadlines, and to discuss any immediate problems.  See id. at 17.

81.    In January 2005, Jerabek completed Ram's interim performance review for the period between September 4, 2004 through January 21, 2005.  See Defendants' Exhibit V, Employee Development and Appraisal (dated January 21, 2005).  Because Ram declined to review the performance evaluation with Jerabek -- asserting that it was too stressful on his heart -- Jerabek documented his feedback in a written memorandum.  See Defendants' Exhibit V, Memorandum from Ned Jerabek to Record (dated January 28, 2005).  Jerabek's memorandum indicated that Ram needed to improve his SOB technical analysis and identified areas in which Ram needed to perform more research.  See id.  Jerabek also sent Ram an e-mail expressing his concern that Ram had not volunteered for any special projects that had been discussed at staff meetings and requesting Ram

attend all the upcoming training sessions as those hours would count for special project credit.  See
Defendants' Exhibit V, E-mail from Ned Jerabek to Bhanu Ram (dated January 18, 2005).

82.     On February 17, 2005, Jerabek sent a memorandum to Ram describing errors in Ram's
preparation of Permit P175-R1.  See Defendants' Exhibit CO, Memorandum from Ned Jerabek to
Bhanu Ram (dated February 17, 2005).  The memorandum identified numerous problems and
mistakes with the data Ram entered into TEMPO and with the SOB he prepared for the permit.  See
id. at 1-2.  The memorandum also acknowledges that, since Ram's annual review in November 2002,
he had earned less than satisfactory ratings on annual and interim performance reviews regarding the
quality of his work.  See id. at 1.  Jerabek informed Ram that, if he was unable to improve his work
in the future, he would be subject to further disciplinary action.

> Without correction, the technical faults could have resulted in permitting appeals
> and/or additional permitting action to fix the errors. At a minimum, the image of the
> Department would have suffered due to the very poor quality and inappropriate
> language of the permit. Poor quality work product in the future will lead to
> disciplinary action. If you do not understand the corrections and comments please
> come and discuss them with me.

Id. at 2.  Jerabek also met personally with Ram to explain his concerns regarding Permit P175-R1.
See Defendants' Exhibit CO, Handwritten Notes of Ned Jerabek (dated February 18, 2005).

83.     Jerabek completed a second interim performance review of Ram in May 2005.  See
Defendants' Exhibit W, Employee Development and Appraisal (dated May 10, 2005).  In association
with the May 2005 performance review, Jerabek sent Ram an e-mail informing Ram that he had
grossly inflated the reporting of his special project hours, from 39.5 to 94 hours, and included a
training session in his report that did not take place.  See Defendants' Exhibit W, E-mail from Ned
Jerabek to Bhanu Ram (dated May 4, 2005).

84.     On June 30, 2005, Jerabek composed review comments on Ram's preparation of Permit P034-R1.  See Defendants' Exhibit CS, Review Comments on Proposed Permit P034-R1 Decker Junction Compressor Station.  In his comments, Jerabek noted that, in accordance with the action plan that had been developed for Ram, Permit P034-R1 was to have been submitted for final review by May 20, 2005.  See id.  Jerabek stated that the notes in TEMPO indicated that the permit was drafted on January 7, 2005, but not submitted for managerial review until April 12, 2005; Jerabek returned the reviewed draft with comments on April 27, 2005.  See id.  On June 16, 2005, Ram submitted Permit P034-R1, along with two other permits, for final review two and one-half weeks before the overall completion deadline.  See id.  Jerabek informed Ram that this submission contravened his instructions and agency regulations.  See id.

> On a rare occasion when we were in jeopardy of missing our regulatory deadline for issuance, we have simultaneously done the public notice and EPA review, but only after receiving comment from the applicant and after I was satisfied that the permit was in very good shape.  None of these criteria fit this case.  The regulatory issuance deadline for P034-R1 is September 30, 2005.  The action plan established dates to submit the draft permit on January 10, 2005, the proposed permit on March 31, 2005 and the final permit on May 20, 2005.  You state in your May 4 reply to my email of May 3 that P034-R1 was on hold because you asked for clarification from Bobby Myers.  Seeking clarification on data in the application is a normal and common occurrence in the permit review process and that is why the TEMPO WAL sets a date of three months past "ruled complete" to do the technical analyses and produce an SOB.  P034-R1 was ruled complete on March 31, 2004.  You submitted the SOB for review six months later on September 29, 2004 and the draft permit more than a year after ruled complete on April 12, 2005.  This is an example of poor performance, trying to complete the majority of the permit application review late in the review period, which results in poor quality and skipping review steps.  Therefore, this permit has been reviewed as the proposed permit.  Please incorporate my corrections and resubmit for final review.

Id.  Jerabek informed Ram that the quality rating for Permit P034-R1 would reflect Ram's poor performance.  See id.

-35-

85.     In July 2005, Ram received an overall rating of "requires attention" on his final performance review.  See Defendants' Exhibit X, Employee Development and Appraisal at 4 (dated July1, 2005)("Ram's July 1, 2005 Review").  Among the reasons constituting the basis for this rating, Jerabek cited the fact that five permits were behind the intermediate deadlines established in Ram's action plan, incorrect data was entered on three permits, and four permit applications were not processed in accordance with permit review guidelines.  See Defendants' Exhibit EA, Memorandum from Ned Jerabek to Record at 1-2 (dated July 7, 2005).  Ram declined to complete the employee self-review portion of the July 2005 performance review.  See Ram's July 1, 2005 Review at 3.

86.     On July 22, 2005, Norton issued Ram a Notice of Contemplated Action-Termination followed by an August 10, 2005 Notice of Final Action-Termination, which set forth the following grounds for Ram's termination: (i) Ram had not met minimum performance standards over almost three years despite Jerabek's efforts to assist him throughout that time; and (ii) Ram had received several reprimands and a suspension -- all issued because of poor performance or insubordination. See Defendants' Exhibit CW, Letter from Jim Norton to Bhanu P. Ram (dated July 22, 2005); Defendants' Exhibit CX, Letter from Jim Norton to Bhanu P. Ram (August 10, 2005).

87.     Goodyear, AQB's Bureau Chief, Mary Uhl, former Bureau Chief Ely, Bentley and AQB's counsel, Tracy Hughes, reviewed and approved the written reprimands that Jerabek issued to Ram.  See Dec. 28 Transcript at 27:2-12 (Norton).  Ely and Norton conferred with each other regarding the contemplated actions.  Neither Jerabek nor Goodyear was the final decision maker, and neither offered his opinion regarding Ram's transfer request, suspension, or termination.  See Dec. 26 Transcript at 37:4 (Jerabek).  Neither Jerabek nor Goodyear had the authority to take personnel actions, including termination, against Ram.  See Dec. 28 Transcript at 27:22-28:2 (Norton).  Norton

was the ultimate decision maker regarding the personnel decisions involving Ram.  See Dec. 27 Transcript at 283:20-25 (Norton).

88.    The NMED provided a legitimate, non-discriminatory reason for each disciplinary action it took against Ram.  Ram has not presented sufficient evidence to show by a preponderance of the evidence that these reasons were pretextual or that any of the Defendants intended to discriminate against him because of his Indian national origin.  Ram has not presented sufficient evidence to show by a preponderance of the evidence that managers or groups of employees colluded to discriminate against any NMED employees on the basis of national origin.

89.    Lester Drapela has been the manager of the AQB's combined NSR/Title V section since August 2001.  See Dec. 28 Transcript at 98:8-9; 98:16-17 (Drapela).  In October 2003, Jerabek requested Drapela help review two remaining transition permits assigned to Thakur so that the permits could be issued by the EPA's December 1, 2003 deadline.  See id. at 133:20-24 (Drapela). Drapela reviewed Thakur's drafts and proposed permits for Permit P097 and Permit P110.  See id. at 133:5-7 (Drapela).

90.    Drapela discovered that Thakur had sent the proposed permits to the applicants without having Jerabek first review the permits.  See id. at 135:12-17 (Drapela).  Drapela also noted many errors and observed that one of the applicants, Williams Field Services, had submitted written complaints about proposed Permit 097.  See id. at 134:23-135:2 (Drapela).  After advising Goodyear and Jerabek, Drapela redrafted and finalized both permits and issued final permits on November 10, 2003 and November 25, 2003, respectively.  See id. at 139:2-10 (Drapela).

91.    Drapela assigned Thakur a rating of "needs improvement" on both Permit P097 and Permit 110.  Id. at 142:17-19 (Drapela).

92.     Jerabek issued Thakur a letter of reprimand on March 11, 2004, alleging poor performance.  See Defendants' Exhibit DN, Memorandum from Ned Jerabek to Mahesh Thakur at 1 (dated March 11, 2004).  The letter of reprimand indicated that Thakur's failure to follow procedural requirements led to errors:

> On Thursday March 4, 2004, Mr. Michael Lane of Williams Field Services sent an E-mail (attached) complaining that the draft permit submitted to him for review was full of typographical errors, was not submitted timely for thorough review, was not adequately reviewed at the Bureau, had incorrect emission limits, made review for sustenance difficult, and noted that errors in references to incorrect permits and emission limits can lead to significant compliance and possible enforcement actions.

Id.  Jerabek explained that Thakur's failure to follow the proper review procedures "puts a major burden on the manager at the last minute in trying to review the permit and meet the deadline."  Id. at 2.  Thakur admitted that there were mistakes in the permit but alleged that Lane was not dealing with Thakur in a professional manner.  See Dec. 19 Transcript at 134:8-10 (Thakur); Dec. 21 Transcript at 55:12-14 (Thakur).  Thakur also admitted that he was unsure whether Jerabek had reviewed the permit before it was sent to the applicant.  See Dec. 21 Transcript at 52:16-20 (Thakur). Despite this reprimand, Thakur received a "successful" rating on his May 2004 performance review. Dec. 26 Transcript at 269:12-14 (Jerabek).

93.     In December 2005 or January 2006, Thakur applied for a supervisory position in the permitting section.  See Dec. 19 Transcript at 127:2-3 (Thakur).  Kimbrell received the position.  See id. at 127:8 (Thakur).  Kimbrell joined the AQB in 2002.  See id. at 128:20-21 (Thakur).

94.     The NMED provided a legitimate, non-discriminatory reason for the disciplinary action it took against Thakur.  Thakur has not presented sufficient evidence to establish by a preponderance of the evidence that these reasons were pretextual or that any of the Defendants

intended to discriminate against him because of his Indian national origin.  Thakur has not presented sufficient evidence to establish by a preponderance of the evidence that managers or groups of employees colluded to discriminate against any NMED employees on the basis of national origin.

95.     When Ram and Thakur joined the AQB in 1996 and 1997, the median hourly salary of Indian national origin permitters was higher than that of non-Indian permitters.  See Plaintiffs' Exhibit 82, Graph 1, Median Highest Hourly Permitter Salary by National Origin and Year.

96.     From November 1999 to February 2005, the salaries of Thakur and Imamuddin were always higher than the salary of Simpson, an Anglo permitter who primarily worked in the Title V section under Jerabek's supervision.  See Plaintiffs' Exhibit 82, Table 5, Permitters' Highest Hourly Salaries by National Origin and Year ("Table 5").  Ram's salary was higher than Simpson's until 2004, when Ram did not receive a salary increase because of poor performance reviews.  See id.

97.     Thakur's salary was higher than the salary of Kimbrell, an Anglo permitter, in the years 2002 through 2004.  See id.  In 2005, Thakur's salary was $20.46 per hour and Kimbrell's salary was $20.48 per hour.  See id.  Imamuddin's salary was always higher than Kimbrell's salary.  See id.

98.     Rhonda Payne, an Anglo permitter, was hired in the Title V permit section, under Jerabek's supervision, in 2005; the salaries of both Thakur and Imamuddin were higher than Payne's salary.  See id.

99.     In 2002 and 2003, neither Jerabek nor any of the permitters in the Title V section received salary increases.  See id.  The New Mexico Legislature did not approve funding for a cost of living raise for state employees in those years.  See Defendants' Exhibit EG, Classified Service General Salary Increase History at 8.

100.    Ram and Thakur have not presented sufficient evidence to prove by a preponderance

of the evidence that the Defendants intended to pay Indian permit engineers less than similarly situated non-Indians, or that Indians were actually paid less than non-Indians.

101.    In 1994, Goodyear became the first manager of the Title V section.  See Dec. 28 Transcript at 188:14-16 (Goodyear).  Goodyear hired six engineers, three from India and three from the United States, in the first Title V section: (i) Alires (United States); (ii) Reddi Gudoor (India); (iii) Imamuddin (India); (iv) Brinda Ramanathan (India); (v) Israel Tovares (United States); and (vi) Daniel Zigich (United States).  See id. at 188:18-23 (Goodyear).

102.    Goodyear hired Ramanathan, Gudoor, Manikantan Velappan, Imamuddin, Thakur, Madhavi Challapalli, Raj Solomon and S.K. Gupta, all of whom are from India.  See Dec. 18 Transcript at 189:20-23 (Goodyear).  Goodyear promoted Velappan to Environmental Engineer II. See id. at 189:23-24 (Goodyear).  Velappan had supervisory duties in that position and supervised Jerabek until October 1997, when Jerabek was promoted to Title V Manager/Supervisor.  See Dec. 21 at Transcript at 74:12-14; 110:2-9 (Shively).  Gupta filled Velappan's supervisory position when Velappan left the AQB.  See id. at 122:19-25 (Shively).

103.    In 1998 through 1999, Jim Shively supervised Velappan, Satya Neelakantan, Hanman Gajarla, Arun Dhawan, and Ramanathan.  See id. at 71:22-72:3 (Shively).  All of the Indian permitters working under Shively have left the AQB; some of these individuals left for better paying jobs in the private sector.  See Dec. 18 Transcript at 190:7-13 (Goodyear).  None of the Indian permitters that Jerabek supervised -- Ram, Thakur, or Imamuddin -- have left the AQB voluntarily. See Dec. 21 Transcript at 106:7-9 (Shively).  Thakur and Imamuddin continue to work at the AQB under Jerabek's supervision.

104.    Scott Anderson and Bernie Clark were both permit engineers born in the United

States.  <u>See</u> Dec. 27 Transcript at 169:6-11 (Ely).  During the time Ely was AQB Bureau Chief, she

approved the termination of Gupta, Clark, and Anderson.  <u>See</u> <u>id.</u> at 169:13-15 (Ely).

105.     Solomon was born in India.  Solomon was first employed as an NSR permit engineer

at the AQB from April 2002 through December 2003; Goodyear approved Solomon's hiring.  <u>See</u>

Dec. 26 Transcript at 142:6-8 (Solomon).  In December 2003, Solomon provided the AQB notice

that he was leaving for another position; during that time, his immediate supervisor, Ted Schooley,

and Goodyear attempted to persuade him to remain at the AQB.  <u>See</u> <u>id.</u> at 125:21-126:2 (Solomon).

Solomon left the AQB in December 2003, because he no longer wished to commute from

Albuquerque to Santa Fe, he was offered a higher salary, and he was frustrated that he had not been

promoted within the AQB.  <u>See</u> <u>id.</u> at 120:21-24 (Solomon).  During 2004, both Schooley and

Goodyear contacted Solomon and encouraged him to return to the AQB.  <u>See</u> <u>id.</u> at 126:5-16

(Solomon).

106.     On March 11, 2005, Schooley recommended that Solomon be rehired into the AQB.

<u>See</u> Defendants' Exhibit DC, Memorandum from Ted Schooley to Jim Norton (dated March 11,

2005).  Goodyear endorsed Schooley's recommendation.  <u>See</u> <u>id.</u> at 1.  In the memorandum

requesting authorization to rehire Solomon, Schooley described Solomon as a "tremendous asset"

and asserted that the AQB was "very excited about the possibility of having Mr. Solomon come back

to work for the AQB."  <u>Id.</u>  Solomon returned to the AQB in April 2005, and, in December 2005,

Solomon was promoted to a supervisory position in the NSR permit section and received a 7.5%

salary increase.  <u>See</u> Dec. 26 Transcript at 128:20-129:1; 147:5-7 (Solomon).

107.     Goodyear and Shively had opposing management philosophies, <u>see</u> Dec. 21 Transcript

at 114:4-6 (Shively); Goodyear reprimanded Shively, verbally and in writing, on numerous occasions,

see id. at 124:12-14 (Shively); Dec. 28 Transcript at 207:6-8 (Goodyear).  Before he retired in

December 2003, Shively met with Curry and Norton, regarding his complaints about Goodyear and

his concerns about a particular permit being issued for the Intel Corporation.  See Dec. 21 Transcript

at 117:15-18; 119:6-9 (Shively); Dec. 28 Transcript at 32:7-13 (Norton).  Shively provided Norton

with a list of former employees who had similar complaints -- some of whom were born in India --

but he did not indicate to Norton that Goodyear discriminated against Indian employees.  See

Defendants' Exhibit EK, Letter from Jim Shively to Ron Curry at 2 (dated January 5, 2004); Dec.

28 Transcript at 32:1-2 (Norton).  Shively does not recall ever discussing discrimination against

individuals of Indian national origin with members of management or in managers' meetings.  See

Dec. 21 Transcript at 108:14-23 (Shively).  After the meeting, however, Norton attempted to contact

Solomon and Ramanathan to follow up regarding Shively's concerns.  See Dec. 28 Transcript at

33:18-25 (Norton).  Based on his follow up and his conversations with Hawley, Norton concluded

that any complaints did not rise to the level of national origin discrimination.  See id. at 34:9-10

(Norton).

108.    In 2004, during the period Ely was Bureau Chief, the NMED retained an independent

investigator, Gilbert Ulibarri of Robert Caswell Investigations, to investigate whether there was

discrimination based on national origin against Ram or other Indian employees.  See Dec. 27

Transcript at 178:8-10 (Ely).  In association with the investigation, Ram and Thakur submitted a

seven-page, single-spaced letter detailing their complaints of discrimination and retaliation.  See

Plaintiffs' Exhibit 32, Letter from Bhanu Ram and Mahesh Thakur to Ron Curry, Sandra Ely, and

Richard Goodyear (undated)("Ram's and Thakur's Investigation Letter").  At the conclusion of the

investigation, Ulibarri informed Ely that he did not find evidence of national origin discrimination, see

Dec. 27 Transcript at 178:16-18 (Ely),  and concluded that Ram was not performing his job in a satisfactory manner, see id. at 178:24-179:1 (Ely).  Ulibarri opined that Ram's poor performance was causing poor morale in the permitting section because he was not completing his share of the work, was disruptive in staff meetings, and was hostile to colleagues.  See id. at 179:1-6 (Ely).

109.    In June 2005, as part of its oversight responsibility, the EPA conducted a program review and evaluation of the AQB's Title V program.  See Plaintiffs' Exhibit 17, Letter from Carl E. Edlund to Mary Uhl (dated October 8, 2005) & Accompanying Report.  The EPA concluded that "[t]he NMED has done an excellent job in the administration and implementation of the Title V Operating Permits Program . . . [and] continues to be one of the leaders in terms of Title V permit issuance rates for State agencies in the Region."  Id. at 1.  Upon receiving the EPA's review, Goodyear recognized the Title V staff for their good work in an AQB meeting.  See Dec. 26 Transcript at 73:17-23 (Jerabek).

110.    Ram and Thakur have not presented sufficient evidence to establish by a preponderance of the evidence that any of the Defendants were biased against individuals of Indian national origin or discriminated against them because of their Indian national origin.  The NMED regularly hired and promoted individuals of Indian national origin, and Jerabek and Goodyear successfully supervised a  number of these individuals.

111.    During the transition to TEMPO, data was first migrated from a system called AIRS to a system called AIRS Junior; the data was then migrated from AIRS Junior to TEMPO.  See Dec. 28 Transcript at 57:5-17 (Grant).  Some mistakes were made, and some data lost, in each of these data transfers.  See id. at 72:5-23 (Grant).

112.    In 2003, Kimbrell was given the responsibility of assisting in cleaning the TEMPO

database. See id. at 69:17-19 (Grant). In that role, Kimbrell updated Title V permit information and work-activity logs, changed inaccurate information, and verified that information in the database was correct.

113. The names of permitters who no longer worked at the AQB were never loaded into TEMPO, and therefore permit actions that previous employees had processed showed an error in TEMPO. See Defendants' Exhibit BD, EAFA Issue Memorandum at 1 (dated May 31, 2006)("EAFA Issue Memorandum"). To address this error, Kimbrell entered those permits under his own name or under Jerabek's name. See id.; Dec. 26 Transcript at 51:20-52:5 (Jerabek). Kimbrell did not receive credit in his annual reviews for any points that might have been assigned to his name. See id. at 57:15-18 (Jerabek).

114. The most important EAFA value is not the figure in the TEMPO database, but the value the manager assigns to a permit at the permit engineer's annual review. See id. at 259:20-22 (Jerabek). At that point, the manager adjusts the EAFA value based on whether the permit has been closed, whether it was transferred to another engineer, whether the permit became more or less complex, and whether a public hearing on the permit has occurred. See id. at 259:22-260:1 (Jerabek).

115. Goodyear evaluates Jerabek's job performance in accordance with the AQB's Standards for Evaluating Performance of Permit Managers. See Defendants' Exhibit EF, Standards for Evaluating Performance of Permit Managers. EAFA scores are not a criteria upon which Jerabek is evaluated. See Dec. 26 Transcript at 265:8-9 (Jerabek).

116. Ram and Thakur have not demonstrated that any permit either of them processed was re-assigned to Kimbrell or Jerabek. Ram and Thakur have not demonstrated that any adjustment in

EAFA points was the result of any action other than errors created by transferring the data from previous databases into TEMPO. The NMED investigated each permit for which Ram and Thakur had their scores adjusted and arrived at a non-discriminatory explanation for each permit. See EAFA Issue Memorandum. Historical EAFA scores are not relevant to an employee's performance review. See Dec. 26 Transcript at 260:19-22 (Jerabek); Dec. 28 Transcript at 212:6-9 (Goodyear).

117. Michael A. Stafford, Ph.D., P.E., testified for Ram and Thakur as an expert in air quality permit review. See Dec. 18 Transcript at 82:22-24 (Court). Dr. Stafford offered his expert opinion on three issues: (i) the quality of Ram and Thakur's work compared to other AQB engineers performing similar work; (ii) the quantity of work Ram and Thakur completed compared to other AQB engineers performing similar work; and (iii) whether the same standards of work quality were applied to review Ram and Thakur's work as were used to review other engineers' work. See id. at 83:23-84:7 (Stafford).

118. Ram and Thakur provided Dr. Stafford with the documents and permits he reviewed for his testimony. See Dec. 21 Transcript at 164:25-165:2 (Thakur). Of the nineteen permits Dr. Stafford reviewed, including three permits that Ram completed and two that Thakur completed, Jerabek reviewed only fourteen. See Plaintiffs' Exhibit 52, Report of Dr. Michael Stafford ("Stafford Report"); Dec. 18 Transcript at 185:3-4 (Stafford). Dr. Stafford indicated that he did not pay significant attention to which supervisor reviewed the permits he considered. See Dec. 18 Transcript at 197:24-25 (Stafford). Jerabek was not the supervisor of some of the permit engineers who completed permits that Dr. Stafford reviewed, and some of those permit engineers were not in the Title V section. See Dec. 21 Transcript at 165:20-25 (Thakur). Dr. Stafford did not know whether the permit engineers who completed the permits that he reviewed were in the Title V section with

Ram and Thakur.  <u>See</u> Dec. 18 Transcript at 213:17-20 (Stafford).  At least four of the permits Dr. Stafford reviewed were issued over five years ago.  <u>See</u> Stafford Report.

119.    Dr. Stafford did not review at least two permits -- P018-R1 and P175 -- for which Ram was formally reprimanded.  <u>See</u> Dec. 18 Transcript at 191:14-19 (Stafford).

120.    Dr. Stafford did not review the Initial Draft, Draft, Proposed, and Final permits for each of the nineteen permits he reviewed.  <u>See</u> <u>id.</u> at 166:19-22 (Stafford).  He did not review Final permits for two of the three Ram permits, and for one of the two Thakur permits.  <u>See</u> <u>id.</u>  Dr. Stafford did not review the Permit Quality Review Checklist for any of the permits and, therefore, did not know what score was assigned to the permit or consider the comments that the reviewing supervisor made.  <u>See</u> <u>id.</u> at 168:1-2 (Stafford).

121.    Dr. Stafford was not aware that the EPA had assigned the AQB a December 1, 2003 deadline by which to complete all the Bureau's outstanding transition permits.  <u>See</u> <u>id.</u> at 209:1-5 (Stafford).  Dr. Stafford was not familiar with the AQB's overall workload or completion priorities in the months preceding the December 1, 2003 deadline.  <u>See</u> <u>id.</u> at 209:12-13 (Stafford).

122.    The corresponding documentation that Dr. Stafford reviewed for the permits that engineers other than Ram and Thakur completed was not as comprehensive or detailed as the documentation associated with the permits that Ram and Thakur completed.  <u>See</u> <u>id.</u> at 90:8-13 (Stafford).  Dr. Stafford explained that he was able to see more corrections and mark-ups on Ram's and Thakur's work compared to other engineers, because intermediate documentation of other permit engineers' work was not readily available.  <u>See</u> <u>id.</u> at 138:12-25 (Stafford).  Dr. Stafford admitted that this lack of documentation prevented him from determining whether other permit engineers were subject to the same corrections and amount of corrections as were Ram and Thakur.  <u>See</u> <u>id.</u> at

164:15-22; 165:20-23 (Stafford).  Dr. Stafford also did not have a record of the permit templates that were in effect at the time that some of the permits he reviewed were issued.  See id. at 162:15-22 (Stafford).

123.     Dr. Stafford's analysis of EAFA scores was based on summary score sheets that Ram and Thakur created; Dr. Stafford did not conduct an independent analysis to determine whether the EAFA scores that they presented to him were accurate.  See Dec. 18 Transcript at 146:9-16 (Geran). On the 2005 report upon which Dr. Stafford relied, Kimbrell is attributed EAFA points for the years 1997, 1998, and 2000, despite that Kimbrell was not hired until 2002 and EAFA points were not used before 2000.  See Plaintiffs' Exhibit 98-9, EAFA Scores for January 4, 2005 Report.  The reports also attribute EAFA scores to Jerabek despite that EAFA scores are not a criteria upon which Jerabek is reviewed.  See id.  The reports that Ram and Thakur provided to Dr. Stafford were not designed as a comparative tool.  Dr. Stafford did not review any information indicating how many EAFA reports each engineer was awarded, for purposes of annual review, in association with any particular permit.  See Dec. 18 Transcript at 210:19-22 (Stafford).  Dr. Stafford did not review any performance reviews.  See id. at 211:25-212:3 (Stafford).

124.     Because of the materials Dr. Stafford was given to form his opinion, his testimony was not sufficient to establish by a preponderance of the evidence that the quality of the work Ram and Thakur performed was comparable to that of similarly situated individuals, that they produced a comparable quantity of work, or that the same standards of work quality were not applied to review Ram's and Thakur's work as were used to review other engineers' work.

## CONCLUSIONS OF LAW

1.     The system for assigning an EAFA value to a particular permit is flawed, because it

assigns a disproportionately high value to simple permits that take comparatively little time to complete and depresses the EAFA scores of permit engineers who are assigned more complex permits.  Moreover, because managers have authority to assign specific permits to individual engineers, the assignment mechanism is subject to manipulation that can negatively effect an employee's performance evaluation.  Supervisory employees in the NMED were aware of these flaws in the EAFA system.  See Dec. 26 Transcript at 33:23 (Jerabek); id. at 134:5-8 (Solomon).

2.      Because the most experienced Title V permit engineers were of Indian national origin, and the most complex permits were assigned to the most experienced permit engineers, there was a danger that the system for assigning permits disproportionately depressed the EAFA scores, and therefore had the potential to affect negatively the performance reviews, of Indian permit engineers. The system for assigning permits prevented Ram and Thakur from accumulating high EAFA scores through the completion of numerous simple permits in comparison to less experienced non-Indian permit engineers.

3.      The NMED did not prove that the assignment of EAFA scores or the system used for assigning permits to particular engineers is necessary for the NMED to conduct its permit programs. See 42 U.S.C. § 2000e-2(k)(1)(A)(i).

4.      Indian national origin employees were regularly hired into and promoted within the NMED and specifically, the AQB.

5.      To succeed on their disparate impact claims, Ram and Thakur must prove the existence of employment practices "that are fair in form, but discriminatory in operation."  Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971).  More specifically, disparate impact cases "involve employment practices that are facially neutral in their treatment of different groups but that in fact

fall more harshly on one group than another and cannot be justified by business necessity."  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  See Carpenter v. Boeing Co., 456 F.3d 1183, 1187 (10th Cir. 2006)("A plaintiff may establish a prima facie case of disparate impact discrimination by showing that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group.")(quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1312 (10th Cir. 1999)).  Consequently, in disparate impact cases, unlike disparate treatment cases, proof of discriminatory motive is irrelevant.  See Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991).

6.   To prove discrimination based on a theory of disparate impact under Title VII or the HRA, Ram and Thakur must identify a particular employment practice and "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 994 (1988).  See Gephart v. Delmed, Inc., No. 90-4190, 1992 U.S. App. LEXIS 32815, at * 4 (10th Cir. 1992)("To state a prima facie case of disparate impact, plaintiffs must show a statistical disparity demonstrating that some protected group has been adversely impacted by an employment practice."); Gonzales v. N.M. Dep't of Health, 2000-NMSC-029, ¶ 30, 11 P.3d 550, 560 (quoting Watson v. Ft. Worth Bank & Trust).  Moreover, Ram and Thakur "must not merely show circumstances raising an inference of discriminatory impact but must demonstrate the discriminatory impact at issue."  Kerr v. Valdez, 55 Fed. Appx. 491, 497 (10th Cir. 2002)(quoting Ortega v. Safeway Stores, Inc., 943 F.2d at1242).

7.   While Ram and Thakur proved the EAFA system was flawed, and that it could be manipulated against an individual permit engineer, they did not provide statistical evidence sufficient

to link the use of EAFA values to a disparate impact against permit engineers of Indian national origin

as a class.  The statistical evidence presented to support a claim of disparate impact "must involve

the appropriate comparables, and must 'cross a threshold of reliability before it can establish even a

prima facie case of disparate impact.'"  Ortega v. Safeway Stores, Inc., 943 F.2d at 1243 (quoting

Allen v. Seidman, 881 F.2d 375, 378 (7th Cir. 1989)).

8.      Although statistical evidence may be an important indirect indicator of racial

discrimination, factors such as an inadequate sample size and failure to consider similarly situated

individuals may dilute its value.  See Mayor of Phila. v. Educ. Equal. League, 415 U.S. 605, 621

(1974); Martinez v. Wyoming, 218 F.3d 1133, 1138-39 (10th Cir. 2000).  Moreover, the United

States Court of Appeals for the Tenth Circuit has repeatedly held that, "in order for statistical

evidence to create an inference of discrimination, the statistics must . . . eliminate nondiscriminatory

explanations for the disparity."  Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir.

1994)(quoting Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991)).  See Martinez v.

Wyoming, 218 F.3d at 1139; Doan v. Seagate Tech., Inc., 82 F.3d 974, 979 (10th Cir. 1996).

Finally, because statistical evidence is only helpful when it demonstrates disparate impact among

comparable individuals, statistics that do not "adjust 'for the various performance evaluations and

departmental rankings of the employees included in the statistical pool' do[] not compare 'similarly

situated' employees and therefore 'fail[] to eliminate nondiscriminatory explanations for disparate

treatment.'"  Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1198 (10th Cir. 2006).

9.      The EAFA score reports that Ram and Thakur presented are not reliable.  See

Plaintiffs' Exhibit 82, EAFA Totals from May 2003 Report; EAFA Scores for January 4, 2005

Report; EAFA Scores for December 31, 2005 PAD Report.  The reports reflect EAFA scores for

certain employees in years before they were employed at the NMED, indicate scores for years before the EAFA system was implemented, and attribute points to individuals who are not evaluated based on EAFA scores. Moreover, managers have the authority to adjust EAFA scores to reflect properly an employee's permit workload, and the reports that Ram and Thakur submitted do not indicate how many EAFA points each permit engineer was actually awarded for purposes of his annual review.

10.     The salary tables that Ram and Thakur presented are also not reliable. First, the sample size is not adequate to produce meaningful results. See Mayor of Phila. v. Educ. Equal. League, 415 U.S. at 621 (suggesting that inadequate sample size may dilute the probative value of statistical evidence). The evidence of disparate impact Ram and Thakur presented is limited to the highest hourly salary for fifty-two individuals, including twelve designated as Indians, for the years 1997 through 2005. See Table 5. More specifically, within the Title V section that Jerabek supervised since 1997, there have been, at most, five permit engineers at any given time. The Court is not convinced that these figures constitute an adequate sample to make any conclusions that might be drawn from the salary analysis meaningful.

11.     Second, the Court does not believe the fifty-two individuals included in Ram and Thakur's salary analysis are similarly situated. The salary analysis does not make any distinction between normal permit engineers and other types of employees, i.e. supervisory employees, temporary employees, employees from other NMED divisions, who may have had some permitting responsibility, but whose performance standards may have differed from the Plaintiffs. While Table 5 indicates whether a particular employee has a bachelor's degree or an advanced graduate degree, the salary analysis Ram and Thakur presented does not differentiate between employees with undergraduate degrees or graduate degrees, or consider the subject matter of each employee's

degrees or the relevance of the degree to permitting work.   The salary analysis Ram and Thakur presented does not incorporate the number of years experience each individual employee has, or whether they had any previous professional or personal experiences that might be relevant.

12.     Finally, the evidence that Ram and Thakur presented in support of their disparate impact claims did not eliminate nondiscriminatory explanations for the salary disparity between Indians and Anglos.  See Rea v. Martin Marietta Corp., 29 F.3d at 1456; Martinez v. Wyoming, 218 F.3d at 1139; Doan v. Seagate Tech., Inc., 82 F.3d at 979.  Neither the EAFA score sheets or the salary table incorporate information from performance reviews.  Ram and Thakur have not adequately explained the implications of funding legislation on their claims.  Ram and Thakur have not sufficiently accounted for salary discrepancies between existing employees and new hires who might have been subject to different salary structures.  Ram and Thakur argued that they each have applied to be promoted and were turned down.  They did not present sufficient evidence, however, regarding the qualifications necessary for the specific promotions they sought, nor did they present sufficient evidence demonstrating they were qualified for the positions for which they applied or that they were more qualified than the individuals who received those positions.

13.     Ram and Thakur did not prove by a preponderance of the evidence race discrimination based on disparate impact under Title VII against the NMED.

14.     Ram and Thakur did not prove by a preponderance of the evidence race discrimination based on disparate impact under the HRA against the NMED or Goodyear.

15.     To prevail on their disparate treatment claims in this case, Ram and Thakur must each prove that they were subject to an adverse employment action and that their national origin was a motivating factor in the decision of the Defendant who took the action.  See Whittington v. Nordam

-52-

Group Inc., 429 F.3d 986, 998 (10th Cir. 2005)(noting that the plaintiff has the ultimate burden to prove prejudice).

16.     For the purpose of a disparate treatment claim under Title VII or the HRA, an adverse employment action is one that constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Orr v. City of Albuquerque, 417 F. 3d 1144, 1150 (10th Cir. 2005)(quoting Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003)). See Ulibarri v. N.M. Corr. Acad., 2006-NMSC-009, ¶ 16, 131 P.3d 43, 50 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). The law recognizes "that monetary losses take a variety of forms including shifts in compensation or benefits." Orr v. City of Albuquerque, 417 F.3d at 1150. On the other hand, "conduct that has no more than a de minimus impact on the employee's future job opportunities is not an adverse employment action." Wilson v. Harvey, 156 Fed. Appx. 55, 58 (10th Cir. 2005). See Ulibarri v. N.M. Corr. Acad., 2006-NMSC-009, ¶ 16, 131 P.3d at 50 ("An adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment.").

17.     The Tenth Circuit has explained that, "[i]n recognition of the remedial nature of Title VII, the law in this circuit liberally defines adverse employment action." Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998). The Court concludes that both Ram and Thakur were subject to adverse employment actions. Ram was terminated in August 2005 and, on at least one occasion in December 2005 or January 2006, Thakur was denied a promotion.

18.     Neither Ram nor Thakur, however, has proven by a preponderance of the evidence that his Indian national origin was a motivating factor in any adverse employment action that any

Defendant took.  The NMED, Jerabek, and Goodyear provided a legitimate, non-discriminatory reason for each disciplinary action it took against Ram and Thakur.  Remedial and disciplinary actions were conducted through standard procedures, according to department regulations, and documented with adequate notice and an opportunity to respond provided to Ram and Thakur.  The testimony of numerous witnesses and sufficient documentary evidence corroborates the Defendants' representations that Ram's and Thakur's productivity and professionalism was, at least on occasion, lacking.

19.     The evidence Ram and Thakur presented is not sufficient to prove by a preponderance of the evidence that either the NMED, at the institutional level, or Jerabek and Goodyear, in their individual capacities, were biased against individuals of Indian national origin.  To the contrary, the evidence suggests that Indian employees, and employees of other nationalities, were actively recruited, employed, and promoted within the Department as a whole and, specifically, worked successfully under Jerabek's and Goodyear's supervision.

20.     Ram and Thakur did not present evidence sufficient to prove by a preponderance of the evidence that similarly situated non-Indian employees were treated differently than themselves.  Ram and Thakur did not present sufficient evidence related to another non-Indian employee with similar performance problems who was not disciplined, who was given successful performance ratings, or who was transferred or promoted.

21.     Ram and Thakur did not prove by a preponderance of the evidence race discrimination based on disparate treatment under Title VII against the NMED.

22.     Ram and Thakur did not prove by a preponderance of the evidence race discrimination based on disparate treatment under the HRA against the NMED, Jerabek, or Goodyear.

23.     Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))(internal quotations omitted).  To establish a hostile work environment, Ram and Thakur "must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.'" Pa. State Police v. Suders, 542 U.S. 129, 133 (2004)(quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  The conditions that Ram and Thakur allege to constitute a hostile work environment must be hostile or abusive to a reasonable person in the position of Ram and Thakur.  See Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006)(emphasizing the "objective standard" applicable to hostile work environment cases under Title VII); Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007)(noting, in a hostile work environment case involving sexual harassment, "the jury is to judge the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances").  This determination is made by considering the totality of the circumstances in the workplace, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  See MacKenzie v. Denver, 414 F.3d 1266, 1280 (10th Cir. 2005)(citing Harris v. Forklift Sys., Inc., 510 U.S. at 23).

24.     Ram and Thakur did not present sufficient evidence to establish by a preponderance

of the evidence a workplace bereft with discriminatory conduct that was severe and pervasive to the extent that a reasonable person would find it hostile or abusive.  Ram and Thakur have not presented sufficient evidence to establish that the physical environment or the language or conduct of their colleagues was physically uncomfortable, intimidating, or insulting.  Ram and Thakur have not presented sufficient evidence to establish that the Defendants made derogatory or offensive statements about individuals of Indian national origin, or permitted others to make such statements in the workplace.  To the extent that Ram and Thakur allege that Jerabek and Goodyear socially ostracized individuals of Indian national origin, the Court does not find those allegations credible. Jerabek was the best man in Neelakantan's wedding, see Dec. 20 Transcript at 107:19-21 (Thakur); Thakur testified that he recalled Goodyear attending the wedding of Imamuddin's son, see Dec. 21 Transcript at 175:21-24 (Thakur).  The Court is not convinced that the NMED, or Jerabek and Goodyear, in their individual capacities, were biased against individuals of Indian national origin or permitted an office culture that was hostile to individuals of Indian national origin.  In sum, viewing the evidence objectively, the Court does not believe that a reasonable person in the position of Ram and Thakur would find the workplace hostile or abusive.

25.     Ram and Thakur did not prove by a preponderance of the evidence race discrimination based on harassment or hostile work environment under Title VII against the NMED.

26.     Ram and Thakur did not prove by a preponderance of the evidence race discrimination based on harassment or hostile work environment under the HRA against the NMED, Jerabek, or Goodyear.

27.     It is unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made

a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  To successfully prosecute a claim for unlawful retaliation, Ram and Thakur must each demonstrate that: (i) he engaged in protected opposition to discrimination; (ii) that he was subjected to an action that a reasonable employee would have found materially adverse; and (iii) that a causal connection existed between the protected activity and the materially adverse action.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006)(citing Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. at 2414-15).

28.     Title VII's "anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. at 2412-13.  For their claims under the anti-retaliation provision to be actionable, Ram and Thakur "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

29.     "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. at 2414.  To be considered materially adverse, "an employer's action must be real and significant." Jencks v. Modern Woodmen of Am., 479 F.3d 1261, 1265 (10th Cir. 2007).  The anti-retaliation clause does not shield an employee from "trivial harms," and engagement in protected activity will not "immunize [Ram and Thakur] from those petty slights or minor annoyances that often take place at work and that all employees experience."  Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. at 2415.  A plaintiff's unusual or subjective feeling that an action is materially adverse is not sufficient

to establish a violation of the anti-retaliation clause.  See id.  Finally, "the significance of any given

act of retaliation will often depend upon the particular circumstances. Context matters."  Id.

  30.  Title VII's "prohibition against retaliation protects conduct short of filing a formal

charge."  EEOC v. PVNF, L.L.C., No. 06-2011, 2007 U.S. App. LEXIS 11276, at *35 (10th Cir.

May 14, 2007).  Ram sent a memorandum to Jerabek on August 15, 2001 in which he expressed his

concerns about being assigned a disproportionate number of transit permits and alleged that this

discrepancy was "injustice, discrimination and harassment."  Ram's August 15, 2001 Memorandum.

In the September 10, 2001 memorandum they sent to Ely, Ram, Thakur, and Imamuddin used

language suggestive of discrimination, although they stopped short of expressly alleging any

discrepancy in treatment based on national origin.  Ram openly made allegations of discrimination

against department managers in  at least three staff meetings, including meetings on October 9, 2002,

April 15, 2003, and July 9, 2003.  Ram sent an e-mail alleging mistreatment to all AQB employees

on July 9, 2003.  In the summer of 2003, Ram and Thakur met with Norton to express their

dissatisfaction with Goodyear, but did not, at that meeting, allege that they had been discriminated

against because of their national origin.  Sometime after May 2004, in association with the

independent investigation that Ulibarri performed, Ram and Thakur sent an undated letter to Curry,

Ely, and Goodyear detailing their complaints of discrimination and retaliation.  The Tenth Circuit has

"noted that '[p]rotected opposition can range from filing formal charges to voicing informal

complaints to superiors.'"  EEOC v. PVNF, L.L.C., 2007 U.S. App. LEXIS 11276, at *35 (quoting

Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004)).  The Court finds by a

preponderance of the evidence that Ram and Thakur engaged in activity that Title VII protects.

  31.  The Court also believes the NMED's suspension of Ram in November 2004 and his

termination in August 2005 are actions that would dissuade a reasonable worker from making or supporting a charge of discrimination.

32.     The Court believes that the NMED's failure to promote Thakur in December 2005 or January 2006 would be an act that would dissuade a reasonable worker from making or supporting a charge of discrimination.  Thakur has not proven by a preponderance of the evidence, however, that he took the appropriate steps to be considered for this position.  In his testimony regarding the position, Thakur could not specifically recollect the date the position was available, noting only "that it was December of 2005 or January of 2006."  Dec. 19 Transcript at 127:2-3 (Thakur).  Thakur stated only that Kimbrell received the position.  See id. at 127:8 (Thakur).  Thakur did not present evidence that he submitted a formal application for the position or that he interviewed for the position.  With the exception of noting that he had been in the Title V section longer than Kimbrell, Thakur did not present evidence that Kimbrell was unqualified for the position or that he was more qualified than Kimbrell.

33.     Thakur did not present sufficient evidence to establish that the selection of Kimbrell for the position was based on unlawful criteria.  See Simms v. Okla. ex. rel. Dep't of Mental Health, 165 F.3d 1321, 1330 (10th Cir. 1999)("When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, 'it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria.'")(quoting Colon-Sanchez v. Marsh, 733 F.2d 78, 82 (10th Cir. 1984)).  Moreover, among candidates that possess equal substantive and technical skills, subjective qualities such as communication, leadership, and interpersonal skills are legitimate bases for an employer choosing one candidate over another.  See Mella v. Mapleton Pub. Schs., 152 Fed. Appx. 717, 724 (10th Cir.

2005).  Thakur does not argue that he possessed communication, leadership, and interpersonal skills superior to those Kimbrell possessed.  In sum, Thakur has not established by a preponderance of the evidence that the Defendants' failure to promote him was a materially adverse action for the purposes of his retaliation claims.

34.    Under Tenth Circuit law, it is unclear whether written warnings are materially adverse actions for the purpose of a retaliation claim.  See EEOC v. PVNF, L.L.C., 2007 U.S. App. LEXIS 11276, at *34 n.8.  In Haynes v. Level 3 Communications, LLC, 456 F.3d 1215 (10th Cir. 2006), cert. denied, 2207 U.S. LEXIS 2681 (Feb. 26, 2007), an appeal of a summary judgment, the Tenth Circuit considered whether written warnings and placing an employee on a performance improvement plan, standing alone, can constitute an adverse employment action for the purpose of a retaliation claim.  Citing cases from the United States Court of Appeals for the Sixth, Eighth, and District of Columbia Circuits, the Tenth Circuit in Haynes v. Level 3 Communications, LLC held that they could not.  See id. at 1224 (citing Givens v. Cingular Wireless, 396 F.3d 998, 998 (8th Cir. 2005); Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003); Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002)).  The Tenth Circuit explained that "[a] written warning may be an adverse employment action only if it effects a significant change in the plaintiff's employment status."  Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1224.  On May 14, 2007, however, in EEOC v. PVNF, L.L.C, the Tenth Circuit noted that "we have not had occasion to revisit this holding [in Haynes v. Level 3 Communications, LLC] in light of the Supreme Court's decision in [Burlington Northern & Santa Fe Railway Co. v. White]," the case in which the Supreme Court of the United States "clarified that the challenged action in a retaliation claim need not necessarily result in an adverse effect on the terms or conditions of employment, so long as it would dissuade a reasonable employee from engaging in

protected activity." EEOC v. PVNF, L.L.C., 2007 U.S. App. LEXIS 11276, at *34 n.8.  Because the defendant in EEOC v. PVNF, L.L.C. conceded that the written warning it had issued was materially adverse, the Tenth Circuit did not decide the issue.

35.     The Court does not feel free to declare that Burlington Northern & Santa Fe Railway Co. v. White has overruled Haynes v. Level 3 Communications, LLC.  The Supreme Court did not cite any Tenth Circuit decisions in its discussion of the materially adverse standard in Burlington Northern & Santa Fe Railway Co. v. White, and the Tenth Circuit has acknowledged the Supreme Court's decision without expressly stating what impact the holding has on Circuit precedent.  The Court also acknowledges that, in arriving at its holding in Haynes v. Level 3 Communications, LLC, the Tenth Circuit emphasized that "[m]ost courts that have considered whether a [written warning], standing alone, is an adverse employment action have found it is not."  456 F.3d at 1224.  Moreover, the Supreme Court has denied certiorari in Haynes v. Level 3 Communications, LLC, and the Tenth Circuit declined to modify its holding in Haynes v. Level 3 Communications, LLC when it recently had the opportunity in EEOC v. PVNF, L.L.C.  Nevertheless, the Court believes that there is some tension between the Tenth Circuit's precedent, and the materially adverse standard the Supreme Court explained in Burlington Northern & Santa Fe Railway Co. v. White.

36.     Ram and Thakur have not proven by a preponderance of the evidence that any of the letters of reprimand or performance development plans that were issued to them effected a significant change in Ram's or Thakur's employment status.  Ram and Thakur were not demoted, their pay was not decreased, and their responsibilities were not altered in association with these letters and warnings.  Instead, each of the letters and performance development plans articulated goals aimed to help Ram and Thakur achieve their continued employment.  Without more evidence, the Court

-61-

finds by a preponderance of the evidence that the written warnings, letters of reprimand, and performance development plans were not, under Haynes v. Level 3 Communications, LLC, materially adverse actions.  Were it evaluating Ram's and Thakur's retaliation claims solely in the context of the Tenth Circuit's decision in Haynes v. Level 3 Communications, LLC -- with no reference to Burlington Northern & Santa Fe Railway Co. v. White -- to the extent their retaliation claims are premised on receiving these written warnings, letters of reprimand, and performance development plans, the Court would dismiss those claims.

37.     Nevertheless, because of the importance of written warnings, letters of reprimand, and performance development plans in the context of New Mexico state employment, the Court believes that, applying the standard the Supreme Court articulated in Burlington Northern & Santa Fe Railway Co. v. White, the written warnings and letters of reprimand issued to Ram and Thakur were materially adverse for the purpose of their retaliation claims.  The Court believes that a reasonable employee might view these written reprimands as aspects of their employment record that might contribute to negative performance reviews and result in diminished advancement prospects.  Accordingly, a reasonable employee may be dissuaded from engaging in protected activity to avoid receiving such reprimands.  Consequently, were it to apply Burlington Northern & Santa Fe Railway Co. v. White -- with no reference to Tenth Circuit precedent -- the Court would find that the written warnings, letters of reprimands, and performance development plans issued to Ram and Thakur are materially adverse actions for the purposes of their retaliation claims.

38.     The Court need not decide, however, to what extent, if any, the Supreme Court in Burlington Northern & Santa Fe Railway Co. v. White overruled Tenth Circuit precedent.  The Court believes that, even if it were to apply the more liberal standard articulated in Burlington Northern &

-62-

Santa Fe Railway Co. v. White, and find, for the purposes of Ram's and Thakur's retaliation claims, that the written warnings, letters of reprimand, and performance development plans that were issued to Ram and Thakur were materially adverse irrespective whether they effected a significant change in Ram's or Thakur's employment status, Ram and Thakur still have not proven by a preponderance of the evidence that they were subjected to a retaliatory action that caused them damages for which they can recover.

39.     Ram has not presented sufficient direct evidence to prove by a preponderance of the evidence that there was a causal connection between his engagement in protected activity and any of the materially adverse actions the Defendants took.  The NMED, Jerabek, and Goodyear provided a legitimate, non-discriminatory reason for each disciplinary action it took against Ram.  Remedial and disciplinary actions were conducted through standard procedures, according to department regulations, and documented with adequate notice and an opportunity to respond provided to Ram. On October 8, 2004, before suspending Ram, Norton issued Ram a notice of contemplated action indicating that the AQB intended to suspend him for his failure to comply with the May 5, 2004 letter of reprimand that had been issued to him.  On July 22, 2005, before Ram was terminated, Norton issued him a notice of contemplated action, and both this notice and his eventual termination letter identified non-discriminatory grounds for the termination.  Specifically, the notice and letter stated that: (i) Ram had not met minimum performance standards over almost three years despite Jerabek's efforts to assist him throughout that time; and (ii) Ram had received several reprimands and a suspension -- all issued because of poor performance or insubordination.

40.     The Tenth Circuit has explained that, at least at the summary judgment stage of a retaliation case, the Court may infer a retaliatory motive when adverse action closely follows

protected activity.  See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  The Court believes this inference is a helpful guidepost in evaluating the causation prong of Ram's retaliation claims in the absence of direct evidence.  Nevertheless, unless the materially adverse actions to which Ram was subjected are "very closely connected in time to the protected activity, [he] must rely on additional evidence beyond temporal proximity to establish causation."  Piercy v. Maketa, 480 F.3d 1192, 1198 (10th Cir. 2007)(emphasis in original).

41.    Ram sent a memorandum to Jerabek on August 15, 2001 and sent a memorandum, with Thakur and Imamuddin, to Ely on September 10, 2001.  Evidence was presented that Ram openly made allegations of discrimination against department managers in at least three staff meetings, including meetings on October 9, 2002, April 15, 2003, and July 9, 2003.  Ram sent an e-mail alleging mistreatment to all AQB employees on July 9, 2003.  In the summer of 2003, Ram and Thakur met with Norton to express their dissatisfaction with Goodyear.

42.    The Court also acknowledges that, sometime after May 2004, in association with the independent investigation that Ulibarri conducted, Ram and Thakur submitted a letter to Curry, Ely, and Goodyear detailing their complaints of discrimination and retaliation.  See Ram's and Thakur's Investigation Letter.  The letter is undated, however, and the only testimony the Court has found indicating a more precise date is Ram's agreement with his counsel's assertion that he and Thakur wrote the letter in the "summer of 2004."  Dec. 22 Transcript at 122:21-123:5 (Ram).  Based on the record before it, the Court notes that the letter could have been written any time between the period immediately after the May 12, 2004 incident during which Ram suffered an angina attack after receiving his May 5, 2004 letter of reprimand, and the end of the summer in August or September 2004.  Because Norton issued Ram a notice of contemplated action indicating that the AQB was

contemplating suspending him for two days on October 8, 2004, were this case at the summary judgment stage, this discrepancy might have meaningful legal consequences. See Anderson v. Coors Brewing Co., 181 F.3d at 1179 (comparing Ramirez v. Okla. Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994)(ruling one and one-half month interval between protected activity and adverse action may, by itself, establish causation), with Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(ruling three month period, standing alone, is insufficient to establish causation)).  At this point in the proceedings, however, it is enough to say that Ram has not presented sufficient evidence for the Court to make a finding that there was a causal connection between Ram's and Thakur's Investigation Letter and any subsequent materially adverse action based on temporal proximity alone.

43.     On July 18, 2003, nine days after Ram had spoken at the July 9, 2003 staff meeting and sent the e-mails to all AQB staff alleging discrimination, Jerabek issued him a letter of reprimand. In the letter of reprimand, Jerabek notes that Ram had "been counseled twice in the past concerning the inappropriateness of making derogatory remarks about other staff and making unsupported accusations of discrimination in staff meetings." July 18, 2003 Memorandum at 1.  The Court finds by a preponderance of the evidence that the language and timing of this letter establishes a causal connection between Ram's protected activity and the letter of reprimand.

44.     Ram has not proven by a preponderance of the evidence, however, that he suffered any harm or loss as a result of receiving the July 18, 2003 letter.   Ram's pay was not decreased and he was not demoted.  Although Ram presented evidence that he requested a transfer to a less stressful position in August 2003, he did not present sufficient evidence to prove by a preponderance of the evidence that a less stressful position for which he was qualified was available or that he took the necessary steps to be formally considered for such a position.  Moreover, Ram did not present

evidence to prove by a preponderance of the evidence that the July 18, 2003 Memorandum, specifically, exacerbated his pre-existing health ailments or elevated his stress level above what he already perceived them to be before receiving the memorandum.  Ram did not present evidence sufficient to prove by a preponderance of the evidence that his work environment became more restrictive or that his relationships with his colleagues materially changed after July 2003.  Indeed, within weeks of issuing the letter of reprimand, Jerabek approved Ram's request for a one-month vacation so that he could travel to India.  Finally, although one of the reasons that the NMED cited for Ram's termination was that he had received several reprimands for poor performance or insubordination, Ram has not presented sufficient evidence to prove by a preponderance of the evidence that the July 18, 2003 letter of reprimand was a dispositive factor in the NMED's decision to terminate him.  Ram's termination did not occur for more than two years after receiving the July 18, 2003 letter of reprimand.  In that interim period, Ram received a formal letter of reprimand in May 2004 and informal correspondence regarding errors or problems with specific permits in February and June of 2005.  Ram received interim performance reviews in December 2003, September 2004, January 2005, May 2005, and July 2005.  In sum, Ram has not presented evidence sufficient to establish by a preponderance of the evidence that the issuance of the July 18, 2003 letter of reprimand caused him to suffer damages for which he can recover.

45.     The Court does not believe that there is sufficient temporal proximity between Ram's protected activity and the other actions that Ram suffered -- and which could be considered materially adverse under Burlington Northern & Santa Fe Railway Co. v. White -- to establish causation without supplemental evidence of retaliatory behavior.  Ram left for India on or about October 1, 2003 and did not return until December 1, 2003.  Ram's 2003 performance review, for which he received a

"needs improvement" rating, is dated December 11, 2003.  Ram exchanged e-mail with Jerabek in early April 2004 regarding the lack of work that had been completed on Permit P018-R1, and received a letter of reprimand noting problems with Permit P018-R1 and Permit P126-R1 on May 5, 2004.  Ram was not noticed of his potential suspension until October 8, 2004, however, and the suspension was not imposed until November 2004.  Ram was not terminated until August 2005.  Given Ram's prolonged absence in India for two months of that period, and the comprehensive documentary evidence related to his poor performance and failure to comply with management's instructions in the interim period, the Court does not believe that Ram has established by a preponderance of the evidence that the materially adverse actions any of the Defendants took against him, with the exception of the July 18, 2003 letter or reprimand, were in retaliation for his participation in activity that Title VII protects.

46.     The Court believes that, applying the Burlington Northern & Santa Fe Railway Co. v. White standard, the March 11, 2004 letter of reprimand that Jerabek issued to Thakur was a materially adverse action.  Nevertheless, Thakur has not presented evidence sufficient to establish by a preponderance of the evidence that he engaged in protected activity before receiving this letter after his and Ram's meeting with Norton in the summer of 2003.  Because of the length of time between his protected activity and the materially adverse action to which he was subjected, Thakur must present supplemental evidence to establish the causation element of his retaliation claim.  In the March 11, 2004 letter of reprimand, Jerabek provides legitimate, non-discriminatory reasons for issuing the letter.  The letter cites procedural errors that Thakur made on a permit for Williams Field Services ("WFS") and references specific complaints that WFS' representative made about the permit Thakur composed.  Thakur concedes that there were mistakes in the permit that the letter of

-67-

reprimand referenced.  Moreover, two months later, in May 2004, Thakur received a successful rating on his May 2004 performance review.  The Court does not believe that Thakur has established by a preponderance of the evidence that the March 11, 2004 letter of reprimand that he received was issued in retaliation for his participation in protected activities.

47.    Ram established by a preponderance of the evidence that the NMED, Jerabek, and Goodyear retaliated against him unlawfully by issuing him a letter of reprimand on July 18, 2003. Ram has not presented, however,  evidence sufficient to establish by a preponderance of the evidence that the issuance of the July 18, 2003 letter of reprimand caused him to suffer damages for which he can recover.

48.    Thakur did not prove by a preponderance of the evidence unlawful retaliation against the NMED, Jerabek, or Goodyear.

49.    Federal law provides a cause of action to plaintiffs who have been deprived of a federal right by individuals acting under color of state law.  See 42 U.S.C. § 1983.

50.    In exercising their supervisory authority over AQB employees, Jerabek and Goodyear were acting under color of state law.

51.    The Court has already decided that the evidence Ram and Thakur presented is insufficient to prove by a preponderance of the evidence that Jerabek and/or Goodyear intentionally discriminated against Ram and Thakur because of their Indian national origin, or that Jerabek and Goodyear treated individuals of Indian national origin differently than non-Indian individuals.

52.    Ram and Thakur did not prove by a preponderance of the evidence that Jerabek and/or Goodyear violated their constitutional rights to equal protection.

53.    The First Amendment protects individuals' rights to speak about national origin

discrimination.  See U.S. Const. amend. I.  The Tenth Circuit has characterized it as "well-established

that a public employee does not waive all her First Amendment rights by accepting public

employment."  Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1276

(10th Cir. 2007)(citing Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006)).

        54.     To determine whether an employer has impermissibly retaliated against an employee

for the employee's exercise of his First Amendment rights, courts in the Tenth Circuit apply a four-

part test derived from the Supreme Court's opinions in Pickering v. Bd. of Educ., 391 U.S. 563

(1968), and Connick v. Myers, 461 U.S. 138 (1983).  See Deschenie v. Bd. of Educ. of Cent. Consol.

Sch. Dist. No. 22, 473 F.3d at 1276 (citing Dill v. City of Edmond, 155 F.3d 1193, 1201 (10th Cir.

1998)).

            First, [the] court "must determine whether the employee's speech involves a matter
        of public concern."  Second, if this threshold requirement is satisfied, [the] court then
        balances "the employee's interest in commenting upon matters of public concern
        against the interest of the State, as an employer, in promoting the efficiency of the
        public services it performs through its employees."  Third, if the employee's interest
        outweighs that of the government, "the employee then must show that the speech was
        a substantial factor or a motivating factor in the detrimental employment decision."
        Fourth, if the employee shows the protected speech was a substantial factor, the
        burden shifts to the employer to show "it would have taken the same action against
        the employee even in the absence of the protected speech."

Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d at 1276 (quoting Dill v. City

of Edmond, 155 F.3d at 1201-02)(internal citations omitted).  The first two matters are questions of

law; the second two are questions of fact.  See Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir.

1996).

        55.     The statements Ram and Thakur made regarding national origin discrimination in the

AQB were not statements pursuant to their official duties as permit engineers and involved issues of

public concern.  See Connick v. Myers, 461 U.S. at 148 n.8 (describing racial discrimination as "a matter inherently of public concern").  Consequently, the statements fall under the auspices of the First Amendment.  Cf.  Garcetti v. Ceballos, 126 S. Ct. at 1960 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

56.     The Court does not believe that the state has an interest that outweighs Ram's and Thakur's right to protest discrimination against Indian national origin individuals within the NMED. The Defendants have not presented evidence that such discrimination is necessary for the NMED to perform its statutorily defined objectives efficiently.

57.     The evidence Ram and Thakur presented, however, is not sufficient to prove by a preponderance of the evidence that their exercise of First Amendment rights was a motivating factor in any detrimental employment action that Jerabek or Goodyear took.  The NMED, Jerabek, and Goodyear provided a legitimate, non-discriminatory reason for each disciplinary action they took against Ram and Thakur.  Remedial and disciplinary actions were conducted through standard procedures, according to department regulations, and documented with adequate notice and an opportunity to respond provided to Ram and Thakur.

58.     Ram and Thakur did not prove by a preponderance of the evidence that Jerabek and/or Goodyear retaliated against them for exercising their First Amendment rights.  Jerabek and Goodyear proved by a preponderance of the evidence that they would have taken the same steps against Ram and Thakur even if Ram and Thakur had not exercised their First Amendment rights.

59.     Ram and Thakur did not prove by a preponderance of the evidence that Jerabek and

Goodyear conspired with each other, or any other person, to violate the constitutional rights of Ram and Thakur.  See 42 U.S.C. § 1985(3).  Insufficient evidence was presented that managers or groups of employees colluded to discriminate against any NMED employees on the basis of national origin. Ram and Thakur did not prove by a preponderance of the evidence that their constitutional rights were violated.  See Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993).

**IT IS ORDERED** that the claims contained in the Plaintiffs' Third Amended Complaint are dismissed.  The Court finds on the Defendants' behalf, and against the Plaintiffs, on all claims.  The Court will enter an amended final judgment in this matter consistent with these Amended Findings of Fact and Conclusions of Law.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

George T. Geran
Santa Fe, New Mexico

    *Attorney for the Plaintiffs*

M. Karen Kilgore
White, Koch, Kelly & McCarthy, P.A.
Santa Fe, New Mexico

    *Attorneys for the Defendants*